Marc S. Culp, *Pro Hac Vice* Application Pending
mculp@cdhllp.com
Benjamin S. Dyer, *Pro Hac Vice* Application Pending
bdyer@cdhllp.com
**CULP & DYER, LLP**
222 E. McKinney, Suite 210
Denton, Texas  76201
Telephone: (940) 484-2236
Facsimile: (940) 484-4436

Timothy G. Williams (SBN 193810)
williams@popeberger.com
Stephanie Reynolds (SBN 220090)
reynolds@popeberger.com
**POPE, BERGER, WILLIAMS & REYNOLDS, LLP**
401 B Street, Suite 2000
San Diego, California  92101
Telephone: (619) 595-1366
Facsimile: (619) 236-9677

Mandeep S. Rupal (SBN 279664)
mandeep1233@gmail.com
**RUPAL LAW**
5811 Pine Ave.
Chino Hills, CA 91709
Telephone: (909) 630-9800
Facsimile: (909) 597-6199

Attorneys for Plaintiffs SERGE HAITAYAN, JASPREET DHILLON,
ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA,
individually, and on behalf of others similarly situated

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SERGE HAITAYAN, JASPREET DHILLON, ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA, individually, and on behalf of others similarly situated, | Case No.: 2:17-CV-7454 |
| | **PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF** |
| Plaintiffs, | Collective Action & Class Action |
| vs. | DEMAND FOR JURY TRIAL |
| 7-ELEVEN, INC., a Texas corporation, | |
| Defendant. | |

1

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

## I.     **JURISDICTION AND VENUE**

1. Pursuant to Federal Rules Civil Procedure, rule 8(a)(1), and U.S. District Court for the Central District of California Local Rules ("L.R."), rule 8-1, Plaintiffs SERGE HAITAYAN, JASPREET DHILLON, ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA (collectively, "Named Plaintiffs"), individually, and on behalf of others similarly situated, bring this action against 7-ELEVEN, INC., a Texas corporation ("7-Eleven" or "Defendant"), invoking this Court's jurisdiction under:

A. 28 U.S.C. section 1331, for alleged violations of the federal Fair Labor Standards Act, 29 U.S.C. section 201, et seq. ("FLSA") on an individual and collective action basis.

B. 28 U.S.C. section 1367(a), for violations of the California state wage-and-hour laws alleged herein on a class action basis which are so related to the FLSA claim that they form the same case and controversy.

C. 28 U.S.C. section 1332(d), the federal Class Action Fairness Act, for violations of the California state wage-and-hour laws alleged herein on a class action basis because: there are at least 100 class members in the Named Plaintiffs' proposed class action class; the combined claims of all class members in the Named Plaintiffs' proposed class action class exceed $5 million; and each of the Named Plaintiffs, and at least one member of the proposed class action class, is a citizen of a different state than Defendant.

2. Plaintiff SERGE HAITAYAN ("Haitayan") is an individual, and is a citizen of the State of California. At all times relevant hereto, Haitayan has resided in the City of Clovis, County of Fresno, California. At all times relevant hereto, Haitayan has operated one of Defendant's "7-Eleven" retail convenience stores in his name as a franchisee of Defendant in the City of Fresno, County of Fresno, California. Haitayan has been a 7-Eleven franchisee for 27 years, and is also President of his local 7-Eleven

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

franchisee association, the Sierra Franchise Owners Association in Fresno, California.

3. Plaintiff JASPREET DHILLON ("Dhillon") is an individual, and is a citizen of the State of California. At all times relevant hereto, Dhillon has resided in the City of Chatsworth, County of Los Angeles, California. At all times relevant hereto, Dhillon has operated one of Defendant's "7-Eleven" retail convenience stores in his name as a franchisee of Defendant in the City of Reseda, County of Los Angeles, California. Dhillon is also Vice-President - Business Affairs, of his local 7-Eleven franchisee association, Franchisee Owners Association of Greater Los Angeles.

4. Plaintiff ROBERT ELKINS ("Elkins") is an individual, and is a citizen of the State of California. At all times relevant hereto, Elkins has resided in the City of El Cajon, County of San Diego, California. At all times relevant hereto, Elkins has operated two of Defendant's "7-Eleven" retail convenience stores in his name as a franchisee of Defendant, one in the City of El Cajon, County of San Diego, California, and one in the City of Lakeside, County of San Diego, California. Elkins is also President of his local 7-Eleven franchisee association, the San Diego Franchisee Owners Association.

5. Plaintiff MANJIT PUREWAL ("Purewal") is an individual, and is a citizen of the State of California. At all times relevant hereto, Purewal has resided in the City of Vacaville, County of Solano, California. At all times relevant hereto, Purewal has operated one of Defendant's "7-Eleven" retail convenience stores in his name as a franchisee of Defendant in the City of Vacaville, County of Solano, California. Purewal is also President of his local 7-Eleven franchisee association, the Greater Bay Franchisee Owners Association.

6. Plaintiff MANINDER "PAUL" LOBANA ("Lobana") is an individual, and is a citizen of the State of California. At all times relevant hereto, Lobana has resided in the City of Moorpark, County of Ventura, California. At times relevant hereto, Lobana has operated two of Defendant's "7-Eleven" retail convenience stores in his

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

name as a franchisee of Defendant, one in the City of Simi Valley, County of Ventura, California, and one in the City of Oxnard, County of Ventura, California. In addition, Lobana is a shareholder in a California corporation which, at times relevant hereto, has operated one of Defendant's "7-Eleven" retail convenience stores in the name of the corporation as a franchisee of Defendant in the City of Alhambra, County of Los Angeles, California. Lobana is also President of his local 7-Eleven franchisee association, the Franchisee Owners Association of Southern California.

7. The Named Plaintiffs allege that the relief sought by this action, to them and to the similarly situated individuals on whose behalf they also bring this Complaint (collectively, "Plaintiffs"), is as a result of work personally performed and expenses personally incurred by them in the State of California within the four years before the filing of this Complaint, and continuing to trial.

8. Defendant is a citizen of the State of Texas, with its corporate headquarters, nerve center and principle executive office located at 3200 Hackberry Rd., Irving, Texas  75063. Defendant also maintains a principle business office in California at 1430 Truxton Ave., 5th Floor, Bakersfield, CA  93301.

9. Defendant is in the business of operating "7-Eleven" retail convenience stores which it owns across the United States, and in California. Defendant also operates identical "7-Eleven" retail convenience stores through a network of franchise stores across the United States, and in California, including by the Named Plaintiffs and other Plaintiffs. As part of the operation of Defendant's 7-Eleven stores in California, Defendant employs individuals throughout the State of California.

10. For purposes of the FLSA claim at issue in this action, Defendant is required to comply with the FLSA regarding the work performed by its employees in California; Plaintiffs' employment for Defendant has been subject to the federal FLSA because Plaintiffs had and have an employment relationship with Defendant; because Plaintiffs and Defendant satisfy both the "individual coverage" and "enterprise

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

coverage" criteria of the FLSA; and because the work performed by Plaintiffs for Defendant which is the subject of this action occurred in the State of California; therefore, at all times relevant hereto Defendant had, and still has, an obligation to comply with the FLSA as it relates to Plaintiffs' employment.

11. For purposes of the California employment laws at issue in this action, Defendant is required to comply with certain sections of the California Labor Code, the California Code of Regulations as contained in California Industrial Welfare Commission Wage Order No. 7-2001, originally and as amended, and the California Business & Professions Code regarding the work performed by its employees in California, because Defendant has employed Plaintiffs in California with regard to hours worked and expenses incurred in the course and scope of employment.

12. Venue lies in the U.S. District Court for the Central District of California, Western Division, pursuant to 28 U.S.C. sections 1391(b) & (c) because a substantial number of the events giving rise to the claims asserted in this Complaint occurred within this District and Division, because Defendant resides within and has substantial contacts in this District and Division, because Named Plaintiffs Dhillon and Lobana reside and operate 7-Eleven retail convenience stores within this District and Division, and because a substantial number of the class members on whose behalf this action is brought reside and operate 7-Eleven stores within this District and Division.

## II.   GENERAL ALLEGATIONS AND FACTS
## COMMON TO ALL COUNTS

13. This case is brought on behalf of individuals who are currently operating as of the date of filing of this Complaint, or who come to operate after the date of the filing of this Complaint, one or more of Defendant's "7-Eleven" franchised retail convenience stores in California under the terms of Defendant's "2004 Franchise Agreement" or successor agreements (collectively, "Defendant's FA").

14. In paragraph 2 of Defendant's FA, the franchisees are directed "to hold . . .

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

out to the public as an independent contractor," and to "control the manner and means of the operation of the Store." But, with only limited and very narrow exceptions, the remainder of the Defendant's FA (and incorporated 7-Eleven operational manuals and related directives) impose absolute actual or virtual control over all store operations. In sum, the bulk of Defendant's FA contradicts and renders impossible the directive in paragraph 2, that franchisees are to control the manner and means of the operation of the store.

15. Accordingly, although Defendant classifies Plaintiffs as independent contractors, under the FLSA and applicable California wage-and-hour laws as described herein, Plaintiffs are Defendant's employees as a matter of law, not independent contractors. Defendant's failure to treat Plaintiffs as employees under federal and California laws has caused them significant damage. The Named Plaintiffs bring this action on their own behalf, and collectively on behalf of the Plaintiffs they seek to represent for appropriate relief.

## A. 7-ELEVEN'S RETAIL CONVENIENCE STORE BUSINESS

16. Defendant introduced the convenience store concept in 1927. It operated all such stores as corporate-owned stores until 1964, when it acquired a chain of 126 franchised stores in California. Defendant (and its controlling affiliates) now own or franchise at least 25,000 convenience stores world-wide, over 7,800 of which are Defendant's stores located within the United States; of those, approximately 1,500 are located in the State of California. California has well more than double the number of such stores in any other state.

## B. THE FRANCHISE AGREEMENT

17. The origin of the form franchise agreement entered into between Defendant and Plaintiffs arose from the settlement of class litigation instituted in 1993 as noted in *7-Eleven Owners for Fair Franchising v. The Southland Corporation* (2000) 85 Cal. App. 4th 1135 (the "OFFF Litigation"). In the OFFF Litigation, the First District

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

Court of Appeal affirmed the terms of a settlement agreement on a nationwide class basis. Among the various concessions secured for franchisees in the OFFF Litigation settlement was an obligation that Defendant tender most franchisees a new franchise agreement to become effective January 1, 2004. Although the OFFF Litigation settlement did not specify the precise terms of the 2004 Franchise Agreement, it did set forth certain parameters for the agreement to be tendered, including that it: (a) have a term of at least ten years; and (b) not have a net adverse effect on average Franchisee Net Income in any 7-Eleven Market, all to be determined under the procedures set forth in an exhibit to the settlement agreement.

18. After the conclusion of the OFFF Litigation and completion of the required procedures as set forth in the OFFF Litigation settlement, the "2004 Franchise Agreement" (referred to above as Defendant's FA) was executed by the vast majority of the then existing franchisees in the 7-Eleven franchise system. The 2004 Franchise Agreement had a 15-year term. As new franchisees were added after execution of the core 2004 Franchise Agreement, the same form agreement was used, with limited material changes as it relates to the issues in this case.

19. Attached as Exhibit "A" hereto is a true copy of the Franchise Agreement between Haitayan and Defendant, based on the final form 2004 Franchise Agreement approved pursuant to OFFF Litigation, and which is identical to, or substantially similar to the 2004 Franchise Agreements between Defendant and all Plaintiffs in this action.

## C. **GENERAL CONTROLS UNDER DEFENDANT'S FA**

20. As Defendant admits in its 2016 FTC disclosures, "We [Defendant] retain a significant financial and marketing advisory role in the franchise business than in most other franchisee businesses." By contractual dictate, Defendant's FA and incorporated operating procedures impose more pervasive control over franchisee activity than any other in the United States.

7

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

21. To insure its dominance and control over franchisee operations, Defendant has been given most powers of an employer and all of the harshest, most overreaching rights of a commercial lender, landlord, and personal property lessor. At the core of Defendant's control is its total dominion over every dollar received into or paid out of proceeds generated from every franchise store. Defendant's absolute control over the money insures that Defendant gets paid every single day in full for all matured obligations owed to Defendant before any store creditor, worker or franchisee receives any monetary payment. Defendant's control over the money also is used to impose its will over virtually every aspect of a franchisee operation.

## 1. **Financial Controls**

### a. **Defendant's Fees and Charges**

22. At inception of the franchise relationship, a franchisee must pay an initial Franchise Fee and a $20,000.00 "Down Payment" to cover a portion of the estimated cost value of the initial inventory, initial governmental fees for licenses, permits and bonds, and the initial "Cash Register Fund." Beyond the initial costs of securing a franchise, each franchisee is also obligated to pay Defendant the "7-Eleven Charge." The 7-Eleven Charge is paid in consideration for, among other things: (a) leasing the franchisee's use of the store building and required equipment; and (b) providing services related to training, product inventory acquisition and control, and accounting matters, including bookkeeping and audit work.

23. The amount of the 7-Eleven Charge in the 2004 Franchise Agreement is 50% of "Gross Profit," which, generally, has been increased in the 2016 version. In addition to initial fees and the ongoing 7-Eleven Charge, franchisees also pay Defendant an advertising fee from the franchisee's Gross Profit. The 7-Eleven charge is due and payable daily. The advertising fee is due and payable "in the same manner and at the same time . . . [as] "the 7-Eleven Charge."

/ / /

8

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

### b. Defendant's Control Over Money

24. To insure that the monies owed Defendant are paid every day and given priority over all other creditors, the FA gives Defendant absolute power to select the franchise store's bank account, mandate all store receipts be deposited into that account, and control all payments made out of that account. In sum, Defendant determines when and how any and all payments from store receipts are paid, whether to franchisee, worker or vendor.

### c. Defendant's Control Over Accountings Matters

25. All deposits into and disbursements out of a store's bank account are recorded by Defendant in an "Open Account," which amounts to a daily accounting detailing all franchisee debits and credits, a figurative scorecard keeping track of how the franchisee financially stands with Defendant. The beginning entry into the Open Account is the difference between the initial costs of starting a franchise and the Down Payment that the franchisee is required to make. After debiting the Open Account in an amount equal to the difference between all the initial fees and start-up costs and the Down Payment, Defendant continually maintains a daily running Open Account by crediting all receipts and debiting all withdrawals, including, particularly, all purchases of inventory, all operating expenses incurred, "Draws" taken by the franchisee, and "amounts you owe us [Defendant], regardless of when we [Defendant] pay such amounts for you." Plaintiffs have no control over the Open Account.

26. Defendant is given broad discretion in determining how to account for entries into the Open Account. For example, the initial inventory cost that Defendant sells to the franchisee is set at an "amount we [Defendant] determine to be our approximate cost for the merchandise." Plaintiffs have no such discretion regarding the Open Account.

### d. Defendant's Control as Discretionary Secured Lender

27. Beyond the initial negative balance generated from initial store opening

9

costs, Defendant recognizes that operating expenses may exceed store receipts for at least the first 90 days of operation. If, at any time, the Open Account does not reflect a "Minimum Net Worth" of $15,000.00, then Defendant may terminate Defendant's FA provided no cure within 3 business days after receipt of notice. Plaintiffs have no such right.

28. To insure payment, Defendant holds a first lien against every form of property right that the franchisee owns in relation to the store.

29. Prior to termination, Defendant "may stop financing immediately and declare the unpaid balance in the Open Account immediately due" if "we [Defendant] believe our security interest is threatened."

30. At no time may the franchisee grant a security interest in, or otherwise encumber, the Defendant's FA or the collateral, which is defined broadly to include virtually any and every tangible right that the franchisee holds in relation to the franchise relationship.

**2. Work Controls**

**a. Work Without Pay Before Acceptance as a Franchisee**

31. A prospective franchisee is obligated to complete 300 hours of training before Defendant advises whether the prospective franchisee is qualified and what store he or she will be assigned. If the prospective franchisee is not deemed worthy by Defendant after completing 300 hours of training, that prospect is paid nothing and must pay back Defendant specified expenses.

**b. Franchisees Must Operate Their Stores Every Day of the Year**

32.    A franchisee store must operate "24 hours a day, 7 days a week (except at . . . [the franchisee's option] Christmas day.)" The only exception to 24-hour operation is where a local zoning ordinance mandates store closure, but in such cases a monetary penalty is imposed on the franchisee to Defendant. Otherwise, if the franchisee does not maintain a "24-Hour Operation," then, at Defendant's election, the

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

franchisee can be terminated or the 7-Eleven Charge may be increased.

33. In maintaining the 24-Hour Operation at least 364 days per year, the franchisee must "devote . . . full time and best efforts to the business of the Store and to maximizing the Store's sales and Gross Profit . . . ." When devoting "full time and best efforts" and maintaining the 24 Hour Operation at least 364 days per year, the franchisee must "supervise the Store's operation . . . ."

### c. Monies Paid To Franchisees for Their Work

34. The only money that a franchisee is entitled to receive during the pendency of Defendant's FA are three different draws: the "Weekly Draw," the "Monthly Draw," and the "Excess Investment Draw." None of the draws are available if there is any breach of Defendant's FA. The Weekly Draw is in an agreed upon amount set forth in Defendant's FA at Exhibit "D," ¶ (h). The Monthly Draw is available only if there are increases in Net Worth over a 3 month period. The Weekly, Monthly, and Excess Investment Draws are only available if Net Worth exceeds the Store's total assets plus $15,000.00.

35. If Defendant's FA is terminated, the franchisee is obligated to pay Defendant any unpaid balance in the Open Account.

36. In sum, before the franchisee is entitled to receive any money, the franchisee is obligated to pay a negotiated "Initial Franchise Fee" and initial store opening costs, and work until the initial negative Net Worth plus $15,000 is overcome.

37. If, at termination, a store net worth is negative, then some or all of the franchisee's draws must be paid back to Defendant.

38. In the final analysis, the franchisee is obligated to pay the franchisor to work for free for months, while the franchisor receives up front compensation and financial guarantees backed by dramatic financial controls insuring that the franchisee's ultimate success will carry with it complete assurance that Defendant's

11

ongoing fees will be paid first every single day before the franchisee or any store creditor or worker receives anything.

### 3. Operational Controls

#### a. Control Over Product and Services Sold

39. Defendant has sole control over the initial stocking of product to be sold in the store. Generally, Defendant dictates in totality what services may be sold and what product may be stocked on shelves, including, "the containers, ingredients, condiments, and other items used or furnished" in the preparation or sale of a product.

40. Defendant's absolute control extends to the type and quantity of products sold in the store, including all "Proprietary Products," "Fresh Foods," and regionally or nationally advertised or promoted products and products that are "exclusive to 7-Eleven in the convenience store channel."

#### b. Control Over Sources Used to Acquire Product and Services Sold

41. Defendant admits that, "You [franchisee] must comply with our [Defendant's] standards and specifications for all products and services carried, used or offered for sale at your store." As initial store product originally stocked by Defendant is sold, all replacement product must be obtained from "Bona Fide Suppliers," which is defined to exclude any franchisee or their affiliates.

42. Franchisees may only order replacement product through Defendant's "on-line" ordering system, orders may only be placed once a week during a specified 24-hour time window, and generally, cash purchases are strongly discouraged or prohibited. Of the exclusive Bona Fide Suppliers from which all replacement product must be obtained, eighty-five percent (85%) of inventory replacements must be obtained from Bona Fide Suppliers approved by Defendant identified in Defendant's FA as "Recommended Vendors." One hundred percent (100%) of all Fresh Foods must be purchased from Recommended Vendors that Defendant approves. One hundred percent (100%) of all Proprietary Products and gasoline must be obtained

12

from Defendant or sources it designates and the franchisee is prohibited from offering any competing products. Defendant has abused these rights to control the vendors that can be used to replace product as a means to impose very costly, labor intensive tasks, which are charged 100% to franchisees.

### c. Control Over How Products and Services Are Sold

43. Defendant solely dictates the location, size and layout of the store, the store's decorations, fixtures and furnishings, and the equipment to be used. Such things as the width of aisles and height of shelving are dictated with little regard for safety and crime considerations. The franchisee has no authority to remodel the store premises or to change any of the fixtures without Defendant's consent.

44. Defendant dictates the use of new or different equipment whenever it chooses to do so. Defendant's required equipment includes equipment necessary to provide certain services within the store such as ATM machines, air dispensing equipment, and pay telephones. Franchisees must bear all such costs and have no right to reject it.

45. Defendant absolutely controls how product is packaged and displayed in the franchisee's store.

### d. Control Over Advertising

46. Although the franchisee is required to pay Defendant a half to one-and-a-half percent of its Gross Profits toward advertising costs, the franchisees have no say over how that money is spent.

47. While franchisees are authorized to spend their own monies on additional "local" advertising, any such promotional activity requires Defendant's written approval if the materials have not been prepared or previously approved by Defendant.

48. The franchisee is absolutely prohibited from doing any internet advertising or selling of product or merchandise electronically ("websites, email, mail order or

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

similar means") or otherwise except at the physical location of the store.

### e. Control Over Use of Store Premises

49. Defendant leases the store to the franchisee "solely for the operation of a franchised 7-Eleven Store . . . ." Notwithstanding the landlord/tenant relationship created, Defendant reserves the right to use unlimited portions of the Store for its own designated purposes.

### f. Control Over Food Service Standards

50. The franchisee is obligated to comply with 7-Eleven Foodservice Standards ("Foodservice Standards"). The term 7-Eleven Foodservice Standards is defined to mean "mandatory and suggested quality, foodservice and other reasonable operating standards as may from time to time be established by us [Defendant] and set out in the Operations Manual."

51. Defendant's Operations Manual is over 1,000 pages in length ("Operations Manual"), and as noted above, it changes from time to time at Defendant's discretion.

52. Over time, Defendant has abused the right to control the type of product sold and related setting of standards to impose very costly, labor intensive tasks, which are charged 100% to franchisees.

### g. Control Over Information and Ideas Generated from Store Operations

53. Defendant owns "all information and data compiled by or stored in the 7-Eleven Store Information System" or in "any other store information systems used at or by the Store . . . ." Defendant has the "right to use in any manner we [Defendant] elect (including selling and retaining all proceeds from such sales) the information compiled and managed by or stored in the 7-Eleven Store Information System or any other store information systems used at or by the Store . . . ."

54. The franchisee is required to provide Defendant virtually every conceivable form of information that can be generated relative to store operations, whether created

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

by the equipment that the franchisee is obligated to use or in the hands of third parties.

55. The franchisee is obligated to disclose and grant Defendant a "perpetual royalty-free license to use and sublicense" any new concept, process or improvement in operation or promotion of the store developed by the franchisee or any worker in the store.

56. The franchisee is obligated to maintain strict confidentiality with respect to all such information or anything else deemed confidential by Defendant.

57. In contrast to Defendant's full ownership rights to all information generated from the franchisee store, the franchisee may not use such information in any respect "except in connection with your [franchisee's] operation of the Store and as needed to effectively work with your Store suppliers."

58. In contrast to Defendant's right to sell and retain all proceeds from the sale of information and the entitlement to a royalty free license, the franchisee is required to maintain strict confidentiality and "may not sell all or any part of the information or data compiled by or stored in the 7-Eleven Store Information System to any individual or entity."

### h. Control Over Maintenance of Store Premises and Equipment

59. Defendant is responsible for repainting the store, replacing windows and doors, maintaining the HVAC, and repairing floor coverings, the foundation, parking lot roof, and exterior walls, but only when Defendant considers it necessary. The franchisee is responsible for maintaining everything else, including equipment.

60. Except for maintenance contracts for landscaped areas outside the store, Defendant selects the contractor that the franchisee must use when meeting maintenance obligations.

### i. Control Over General Business Operations

61. Before acceptance as a franchisee, Defendant requires the franchisee to complete Defendant's "Training Program." If the initial training is completed to

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

Defendant's satisfaction, then the franchisees are required to secure various licenses and permits. Only after the initial training is satisfactorily completed in Defendant's opinion, and required licenses and permits have been obtained and all other conditions are satisfied, does Defendant's FA becomes effective and the franchisee begins operating his assigned store.

62. From inception of store operations, the franchisee is obligated to conduct all business "in compliance with  . . . the 7-Eleven Operations Manual and with the 7-Eleven System." The 7-Eleven System is defined to mean the "system for the fixturization, equipping (including the development and use of computer information systems hardware and software), layout, merchandising, promotion . . . including advertising."

63. According to Defendant's FA, the 7-Eleven Operations Manual sets forth "required operating standards and procedures for compliance with the 7-Eleven System," and includes "information regarding . . . . [the provision of] excellent customer service, training, Store operations and accounting procedures . . . ." Defendant's FA also expressly provides that franchisees, "agree to comply with all standards, specifications, operating procedures and other material contained in the 7-Eleven Operations Manual . . . ."

64. The Operations Manual contains hundreds of additional, express directives for franchisees to perform. The Operations Manual contains hundreds more directives relayed by reference to computer links. Incorporated by reference into the Operations Manual is Defendant's "On-Line System Support Guide," yet another substantial electronic directive incorporating other, undefined "printed or on-line manuals we [Defendant] have developed . . . ."

65. By express contractual provision, all such operational rules may be added, amended or modified in virtually any way at any time Defendant decides.

66. Among the multitude of directives imposed by such means is Defendant's

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

"Expand the Assortment" directive dictating new product offerings in the store.

67. Defendant's right to mandate innumerable changes imposes further obligations upon the franchisee and the store's workers to participate in additional trainings to carry out those changes.

68. The franchisee is obligated to be responsible for all expenses related to any additional required training.

69. All internal operations of the store must be conducted through the equipment that Defendant supplies.

70. If the franchisee is an entity and wants to make any changes to that entity, then the franchisee is required to use service providers designated by Defendant.

### j. Control Over Management of Store Employees

71. Among others things, the 7-Eleven System obligates the franchisee to hire workers for the store that are proficient in the English language, have a "clean and neat personal appearance," and communicate with customers in a "prompt, efficient and courteous" manner, which expressly includes "greeting and thanking each customer . . . ."

72. Franchisees are also obligated to require store employees to "wear, only the apparel . . . approved by us [Defendant] while working in the Store."

73. Franchisees are required to train store workers using employee training materials provided by Defendant.

74. To insure that the franchise hires workers acceptable to Defendant, the "Hire Right" Process has been mandated. The "Hire Right" aspect of the 7-Eleven System instructs franchisees on recruiting, job posting, prospect screening and interviewing, and training.

75. The Operations Manual goes further to instruct on employment terms, pay practices, employee benefits, performance appraisals, and discipline, including employment terminations.

17

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

76. Defendant solely controls payment of all wages to both the franchisee and the store's employees.

### k. Oversight to Insure Compliance

77. Defendant is given express contractual oversight rights, including access to all "sales data from the cash registers without any contractual limitations." Defendant also has the right to enter a franchisee's store at any time "for the purpose of conducting inspections to determine whether the Store is in compliance with 7-Eleven Foodservice Standards. If, in the opinion of Defendant, the franchisee has failed to comply with 7-Eleven Foodservice Standards, then Defendant is given the power to "require you [franchisee] to immediately stop serving any or all items from the Foodservice Facility . . . ."

## D. ADDITIONAL FACTS RELEVANT TO MISCLASSIFICATION OF FRANCHISEES

78. As alleged herein, the Named Plaintiffs bring claims, individually and on behalf of Plaintiffs, against Defendant for violation of overtime laws under the FLSA and California law, and against Defendant for violation of laws in California related to business expenses. Defendant violated these laws as a result of its misclassification of franchisees as independent contractors, and not employees.

### 1. Misclassification of Franchisees Under the FLSA

#### a. Judicial Construction of the Controlling Statutory Language

79. Section 207 of the FLSA requires "employers" to pay their "employees" overtime compensation for those who work more than forty hours in a given workweek. The FLSA defines the term "employee" as "any individual employed by an employer." The FLSA defines the term "employ" to include "to suffer or permit to work." According to the United States Supreme Court, a broader or more comprehensive coverage of the terms employee and employ would be difficult to frame.

18

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

80. According to the United States Supreme Court, the test of employment under the FLSA is one of "economic reality." And, according to the Wage and Hour Division of the United States Department of Labor, the "economic realities" test demands focus on whether the worker is "economically dependent" on an employer.

### b. The Federal Six-Factor "Economic Realities" Test

81. In the Ninth Circuit, a non-exhaustive list of six factors are considered when deciding whether it is economically realistic to view a relationship as one of employment or not. The ultimate focus of the economic realities test is whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service, and the six factors considered when assessing the "economic reality" of dependence or independence are: (a) the degree of the alleged employer's right to control the manner in which the work is to be performed; (b) the alleged employee's opportunity for profit or loss depending upon his or her managerial skill; (c) the alleged employee's investment in equipment or materials required for his or her task, or his or her employment of helpers; (d) whether the service rendered requires a special skill; (e) the degree of permanence of the working relationship; and (f) whether the service rendered is an integral part of the alleged employer's business.

82. The directive in Defendant's FA that franchisees "hold . . . out to the public as an independent contractor" is not conclusive, because the economic realities and not contractual labels are dispositive. Stated alternatively, the subjective intent of the parties to a labor contract cannot override the economic realities reflected in the six-factor test.

### c. 7-Eleven Franchisees are Employees Under the Six Factor Test

#### i. Factor No. 1: Right to Control

83. Defendant openly admits in Defendant's FA that it retains "a significant financial and marketing advisory role in the franchise business than in most other

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

franchisee businesses." This admission grossly understates the degree of Defendant's control.

84. Defendant exercises absolute dominion over revenues generated by the franchise store. Defendant receives all money and decides who gets paid when, including that Defendant always gets paid first before store workers, store vendors and the franchisee. Defendant exclusively handles and unilaterally resolves all accounting issues associated with handling money, including who owes whom what under the "Open Account" it maintains. As security to insure payment of any obligation that Defendant determines is owed by the franchisee, Defendant holds a first lien against the few assets that a franchisee owns under Defendant's FA. The franchisee is prohibited from using any of its assets under Defendant's FA to secure financing from any other source. If at any time Defendant believes its security interest is threatened, it can terminate Defendant's FA, declare the entire unpaid balance in the Open Account due without notice or opportunity to cure, and move forward with exercising default rights under its security agreement.

85. Defendant controls virtually every aspect of what and how goods and services are sold in a franchisee store. The franchisee is afforded minimal discretion as to what goods and services may be offered for sale in a franchisee store. Vendor supply sources for most goods and services offered for sale are severely restricted by Defendant's operational rules. Many of the goods and services offered for sale must be entirely purchased from vendors dictated by Defendant. The advertising, packaging, and display of goods and services for sale in the store are virtually 100% controlled by Defendant. A lengthy Operations Manual prepared by Defendant sets forth extensive rules related to foodservice standards and related operations. Defendant, not the franchisee, totally controls how store space is used.

86. Defendant dictates virtually all activities associated with administering the operation of the business. The franchisee must operate its store 24-hours per day

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

(subject only to local zoning restrictions), 7 days a week, and 364 days per year without fail. Throughout this year long, every day, every hour operation, the franchisee is required to work full time and devote best efforts. The workers hired to maintain the year round, 24-hour operation must be proficient in English, satisfy Defendant's appearance and manner standards, and wear clothing mandated by Defendant. Workers also must be trained using materials prepared by Defendant, and the franchisee's compensation and hiring and firing practices are directed in material respects by Defendant. Defendant, not the franchisee, processes all payroll for store workers, paid for by franchisees. Defendant, not the franchisee, also maintains custody over all payroll records for all store workers.

87. Defendant's mandated operational rules that both franchisees and store workers must master are extensive. Mandated rules include those set forth in Defendant's Operations Manual and On Line System Support Guide consisting of more than 1,000 pages of materials and dozens of other computer links and other material created by Defendant. A franchisee must participate in an estimated 300 hours of training before there is any opportunity to be compensated for work. Even after initial training is completed, Defendant retains the right to change operational rules, which may require additional mandatory training. The equipment used to carry out day to day store activities, including, particularly, all point of purchase equipment, is solely and exclusively provided by Defendant. With limited exceptions, the franchisee is responsible for all maintenance obligations, but Defendant dictates the maintenance service provider that must be used when meeting such responsibilities. To insure compliance with the myriad of rules that must be followed, Defendant holds extensive enforcement rights.

88. While Defendant's FA purports to give franchisees control over the manner and means of store operations and control over employment practices and policies, such self-serving characterizations, like contractual labels, do not neuter the reality of

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

what Defendant's FA requires. The Operations Manual, which the franchisee is obligated to follow, mandates a "10 Day Training Plan" for store workers, which is said to provide a "step-by-step" plan to train new employees. The program provides instruction in 25 different categories ranging from customer service, suggestive selling, work safety, and fraud prevention, among many others. The Operations Manual also includes a nearly 50-page guide for handling "human resources," providing directives on such things as employee recruitment, screening and interviewing, disciplinary guidelines, and compensation practices.

## ii. Factor No. 2: Opportunity for Profit or Loss Based Upon Managerial Skill

89. The massive controls imposed by Defendant through Defendant's FA and its incorporated manuals and guides offer little opportunity for the franchisee to exercise any managerial skills beyond: (1) hiring and firing of particular store workers consistent with Defendant's "training;" (2) setting wages pursuant to Defendant's compensation packages; and (3) changing product pricing to the very limited extent feasible in light of the required use of Defendants retail information system ("RIS"). While Defendant touts its price tags on various products as "suggested," the reality is that the labor required to change Defendant's "suggested" pricing is so labor intrusive that it is cost prohibitive to change "suggested" prices for most products sold in the store.

90. Managerial skills associated with those limited activities have little impact on profitability, because most store workers rarely command more than minimum wage and product and pricing is dictated in material respects by competitor pricing and the cost of goods, which are materially controlled by Defendant's contractually mandated "Recommended Vendor" and "Bona Fide Supplier" requirements, neither of which is controlled by a franchisee. More specifically, franchisees cannot feasibly change Defendant's "suggested" pricing system and they have little control over cost

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

of goods, because Defendant, in virtually all material respects, dictates where and from whom products and services must be obtained.

### iii. Factor No. 3: Relative Investment in Equipment, Materials and Helpers

91. Defendant provides everything essential to running the store, including the facility, furniture and fixtures, all allowable equipment, initial inventory, and start-up capital. While the franchisee hires "helpers," there is no choice in the matter, because no one person (or even two or three people) can realistically operate a 24-hour, 364 day a year business by themselves. To the extent that a franchisee can be said to "invest" in "helpers" in this context, it is done only through the discretionary lending of the only banker that the franchisee can use, i.e. Defendant.

### iv. Factor No. 4: Special Skill for Services Rendered

92. Franchisees use no "special skill" beyond the "people skills" discussed in Factor No. 2. Those skills require no special education and no training other than those associated with complying with Defendant's dictates for managing a convenience store. The skills actually exercised involve little more than managing people, carrying out Defendant's contractual mandates, and generally being forced to accede to Defendant's pricing suggestions.

### v. Factor No. 5: Permanence of the Working Relationship

93. Generally speaking, and assuming no breach of onerous termination provisions, Defendant's FA has a 15-year term and subsequent versions of Defendant's FA have a 10- to 15-year term. Permanence of the relationship suggests an employee relationship, because a true independent contractor is not impeded from moving project to project and does not continuously work for the same entity.

/ / /

/ / /

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

### vi. <u>Factor No. 6: Whether Services Performed Are An Integral Part of Employer's Business</u>

94. The franchisee's work entails selling the same goods and services that Defendant sells in its corporate-owned stores. Franchisee stores are not just an integral part of Defendant's business, they are, in fact, a mere extension of the very same business Defendant operates in its corporate-owned stores.

### vii. <u>Summary of the FLSA Six-Factor Analysis</u>

95. The FLSAs six-factor analysis is designed as a tool to assess whether there is economic dependence between Defendant and its franchisees. Franchisees are controlled and dominated by Defendant in every material respect that works to Defendant's benefit, they are integral to Defendant's core business, and franchisees are completely incapable of operating without, and inescapably dependent upon, Defendant for their continued viability and existence.

96. To the extent "economic dependence" is not conclusively established on the face of Defendant's FA, Defendant's actual exercise of contractual powers illustrate that franchisees are Defendant's employees. Defendant routinely exercises its contractual power to reduce franchisee income. For example, by franchisees offering "fresh foods," franchisees are obligated to reduce offerings of pre-packaged food products. Quite obviously, "fresh foods" are labor intensive and, under the terms of Defendant's FA, all labor costs are born 100% by the franchisees. Consequently, Defendant's percentage of net revenues goes up and franchisee earnings go down.

97. Another tactic Defendant has employed to reduce franchisee earnings and promote "dependence" has been to delay replacement of dilapidated equipment essential to running a franchise store. Forcing franchisees to use old and worn out equipment delays Defendant's obligation to cover the cost of replacing equipment, thereby improving Defendant's profits. In contrast, the consequence of Defendant's self-motivated tactic is to increase franchisee labor and equipment maintenance costs,

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

because older equipment makes for inefficient workers and higher costs to maintain.

98. In addition, to increase franchisee costs and impose greater dependence Defendants changed how equipment maintenance was managed. Historically, Defendant devoted an internal staff to managing various vendors involved with equipment maintenance. Defendant has since discharged its equipment maintenance staff and outsourced that responsibility to a third party vendor. By doing so, Defendant passed such management responsibilities to a less qualified group and passed on all the attendant, additional cost to franchisees.

99. Another practice promoting greater franchisee dependence on Defendant involves the ordering of replacement goods for sale in franchisee stores. Because most replacement goods must be ordered through vendors Defendant selects through contracts Defendant negotiates, Defendant has forced franchisees to accept suppliers that offer no support to franchisees such as unloading and stocking shelves. By eliminating such services that historically were commonly provided by vendors, franchisees have been forced to hire more workers to perform these labor intensive tasks previously performed by suppliers. Because all such labor is born entirely by franchisees, Defendant implemented this change in business practice to reduce franchisee earnings and increase franchisee dependence.

100. Franchisee's only prospect for generating a fair wage is to employ fewer workers and extend the franchisee's work hours and/or accept responsibility for running more stores. To advance this goal, Defendant also has increased franchisee dependence by materially changing the 50/50 profit split under Defendant's FA every time Defendant's lease of the store from a third party terminates, whether with or without Defendant's consent or manipulation. Such changed business practices have materially impacted a franchisee's economic dependence upon Defendant.

101. Defendant has used the increased economic dependence to cajole franchisees into buying Defendant's corporate stores or abandoned franchise stores at

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

highly inflated prices just to offer franchisees some chance to maintain required net worth balances in franchisee open account ledgers with Defendant. These tactics have been employed so pervasively that Defendant has materially reduced the number of corporate stores in relation to franchisee stores. Defendant has decided to decrease the number of corporate stores, because Defendant's intentional assault upon franchisee earnings has made the "franchising" part of Defendant's business far more profitable. This assault on franchisee earnings, however, has materially increased franchisee dependence on Defendant to earn a living, which, in turn, further supports a conclusion that Defendant has turned alleged independent contractor franchisees into employees.

### 2. Misclassification of Franchisees Under California Law

#### a. California Law

102. California Labor Code section 1194, and California Code of Regulations, title 8, section 11070, subsection 3 require "employers" to pay their "employees" overtime compensation for those who work more than eight hours in a given workday and forty hours in a given workweek. California Labor Code section 2802, and California Code of Regulations, title 8, section 11070, subsection 9 require "employers" to pay for certain business-related expenses which "employees" incur in the course and scope of employment for their employment.

#### b. The California Three-Prong Test for Employment

103. California Code of Regulations, title 8, section 11070, subsection 3 defines the term "employee" to mean, "any person employed by an employer . . . ," and the term "employ" means, "to engage, suffer, or permit to work." Construing these definitions, the California Supreme Court has held that an "employer" is one who: (1) exercises control over the wages, hours or working conditions of the worker, or (2) suffers or permits the worker's work, or (3) engages the workers, thereby creating a common law employment relationship. Under the terms of Defendant's FA,

26

franchisees provide services for Defendant and franchisees are employees under all three standards in California for establishing an employment relationship.

### c. **Franchisees are Employees Under Each Alternative Test**

#### i. **Alternative No. 1: Control Over Wages, Hours and Working Conditions**

104. Defendant is an employer of the franchisees because it exercises control over the franchisee's wages, hours and working conditions. Defendant's control over franchisee wages is evidenced in multiple provisions of Defendant's FA, including control over the amount and timing of "conditional" draws payable to franchisees.

105. Defendant's control over franchisee hours is just as clear. Defendant's control over working conditions is extensive as to the tiniest of minutia, including the control of temperature settings in franchisee stores. While control over either wages, hours or working conditions is sufficient to satisfy the test for establishing an employment relationship in California, all three are established in relation to Defendant's relationship with its franchisees.

#### ii. **Alternative No. 2: Common Law Employment Test**

106. Defendant is an employer of the franchisees because Defendant has the "right to control" the manner and means by which, i.e., the details, the franchisee accomplishes the work of managing the 7-Eleven store assigned. The so-called "control of details" test is the principal measure for determining a common law employment relationship in California, because whether a common law employer-employee relationship exists turns foremost on the degree of a hirer's "right to control how the end result is achieved." What matters most in California is whether the hirer "retains all necessary control" over its operations; the fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment, where the employer has general supervision and control over it.

107. Defendant's "right to control" how a franchisee accomplishes his/her work

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

is illustrated by Defendant's control over: (a) the store the franchisee will be assigned to operate; (b) the product and services that can be sold; (c) the sources that may be used to acquire product and services to be sold; (d) how and where product and services are advertised, promoted and sold; (e) quality assurance standards for products and services sold; (f) use and ownership of information generated from store operations; (g) how and by whom operational equipment is maintained; (h) training to perform franchisee work, including the nature and amount of training for the franchisee and store workers and whether it was satisfactorily completed; (i) how essential business functions are conducted, including the equipment that must be used in carrying out those functions; and (j) how to train, instruct and pay store workers, including controls over hiring and firing practices, language, dress, appearance, customer interactions and wage payments. Failure to comply with Defendant's extensive system of controls gives rise to Defendant's right to terminate Defendant's FA.

108. Although the "control of details" common law test is the principal measure in assessing whether an employment relationship exists, it is not necessarily the only consideration. For example, the right to discharge at will and without cause provides strong evidence in support of an employment relationship. While Defendant does not have the right to terminate Defendant's FA at will and without justification or cause, franchisees have the right to terminate on 72 hours' notice. The right of a worker to terminate on such short notice is indicative of a franchisee's employee status, because an employee may quit, but an independent contractor is legally obligated to complete his contract.

109.   Work over a period of years as evidenced by Defendant's FA's 10- to 15-year term also evidences an employment relationship, because the notion that an independent contractor is someone hired to achieve a specific result that is attainable within a finite period of time is at odds with those engaged in prolonged service.

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

110.   When assessing the existence of an employment relationship, other "secondary indicia" may also be taken into account. The "secondary indicia" are: (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. Virtually all of these "secondary indicia" indicate that the relationship between Defendant and its franchisees is one of employer-employee.

111.   Management of a convenience store does not involve a distinct occupation or business, especially when store facilities, store workers, and store products are identified by Defendant's name. Managing a 7-Eleven convenience store in California is not an occupation believed to be performed by a specialist without supervision, especially given that, historically, more than 25% of 7-Eleven stores have been corporate-owned and operated and there have been dozens of such corporate stores in California. Especially given Defendant's pervasive controls over a franchisee's operations, the degree of skill required in running a store is minimal.

112.   Defendant provides the store premises where the franchisee will operate and it mandates use of virtually all necessary "instrumentalities and tools" to manage the store. Franchisee's duration of work is defined by time measured at a decade or more and not by job. While Defendant is neither paying by job (supporting independent contractor status), nor  time (indicative of employee status), complex payment arrangements such as that implemented for Defendant's franchisees under Defendant's FA is generally seen to be a neutral factor when assessing employee

29

verses independent contractor classification issues.

113. The job performed by franchisees is part of Defendant's regular business. While the contractual provision requiring franchisees to hold themselves out as independent contractors may reflect a belief that such a relationship would exist, contractual labels are not conclusive, and in fact, an independent contractor "contractual label" will not inhibit a contrary conclusion as a matter of law. This conclusion is especially compelling given how Defendant has compelled franchisee dependence over the last several years by intentionally and tactically manipulating contractual powers to erode franchisee earnings.

### iii. **Alternative No. 3: Suffer or Permit to Work**

114. Defendant must exercise reasonable care to see that work is not performed contrary to law as to any worker Defendant "suffers or permits" to work for it. Defendant violates this standard, because it: (1) mandated 300 hours of work without pay; (2) mandated a contractual arrangement imposing monumental obligations directing a franchisee to use their best efforts and to operate a convenience store up to 24 hours a day, 364 days a year; (3) contractually dictated pervasive controls plainly creating an employment relationship; and (4) failed to take any steps to monitor whether the monumental obligations created were causing its franchisees to forego overtime pay.

## E. **OTHER REASONS WHY FRANCHISEES ARE MISCLASSIFIED AS INDEPENDENT CONTRACTORS BY DEFENDANT**

115. After enduring hundreds of hours of training without pay, a franchisee may be given the opportunity to receive draws, monies they may have to repay if the franchise store comes to a calamitous ending. Throughout the entirety of the relationship, franchisees are subject to an in term non-competition covenant. At any time during the course of the potential 10- to 15-year relationship, franchisees can lose all rights based upon various termination rights held by Defendant.

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

116. Among the circumstances that could lead to early termination includes multiple different default provisions. Among the various, separate default provisions, there are dozens providing for termination upon 45 days' (or less) notice and cure rights. There also are well more than a dozen default provisions permitting termination with 3 days' (or less) notice and cure rights. Additionally, one no cure termination provision arises if, "we [Defendant] determine, in a normal course of business, to cease the operation of all 7-Eleven stores in the state or metropolitan statistical area in which your [franchisee's] store is located."

117. Another termination right arises if Defendant fails to maintain a leasehold interest on the franchisee's store premises. Should any such issues or others arise during the relationship, the franchisee has very limited ability to transfer a store for any good will value generated, because all such rights are subject to numerous limitations, including Defendant's "prior written consent," Defendant's right of first refusal, and Defendant's right to sell a proposed transferee another store.

118. If Defendant's FA is transferred or terminated for any reason, the franchisee is subject to a one year post termination non-competition covenant.

119. Franchisees do not own the store premises, they do not own required equipment, they are dependent upon Defendant for financing, they do not have the accounting and marketing infrastructure necessary to operate, and, by dress and by name, they are required to hold out as a 7-Eleven convenience store. In so far as the average store customer knows, there is no difference between 7-Eleven corporate stores and franchise stores. Given these circumstances, franchisee rights to sell good will, if any, is limited, and generally only allowed to increase franchisee dependence upon Defendant.

120. The 24-hour, 364-day nature of the store also limits the number of potential franchise buyers. Those limitations, plus in-term and post-term non-competition covenants and limits upon use of confidential information leave

31

franchisees with little option other than to remain as Defendant's franchisee on whatever terms, become somebody else's employee, or start over in a completely new and different business.

121. Given these circumstances, there is no genuine question about whether franchisees could stand alone as an independent business operation without Defendant's support; stated alternatively, franchisees are entirely economically dependent upon Defendant for their viability. This reality ends any real, genuine question about franchisee status as Defendant's employee under federal law. While controlling standards under the FLSA and California laws differ slightly, the factors assessed overlap in numerous respects. There is no genuine question that franchisees are the employees of Defendant under both the FLSA and California law. A conclusion that Defendant's franchisees are employees is even more compelling when the remedial purposes of the protective, social legislative policy at issue in this case are taken into account.

## III.   COLLECTIVE ACTION AND CLASS ACTION ALLEGATIONS

### A. FLSA Collective Action Allegations

122.   Haitayan, Dhillon, Elkins and Purewal (the "FLSA Named Plaintiffs") allege this action is appropriately suited for an "opt in" collective action under the FLSA, 29 U.S.C. § 216(b) (a "Collective Action"), as it relates to Count One for violations of FLSA overtime laws against Defendant, because:

A. The FLSA Named Plaintiffs propose to represent themselves and all other similarly situated franchisees of Defendant in California—including those individuals who are currently operating as of the date of filing of this Complaint, or who come to operate after the date of the filing of this Complaint, one or more of Defendant's "7-Eleven" franchised retail convenience stores in California under the terms of Defendant's FA—for violations of the FLSA as alleged herein (i.e., the "FLSA Collective Action Plaintiffs"). The potential

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

group of such FLSA Collective Action Plaintiffs encompasses franchisees who operate 7-Eleven retail convenience stores either as an individual franchisee or in the name of an entity franchisee, to the extent any such franchisee has personally worked hours that constitute overtime hours under the FLSA. This potential group of such FLSA Collective Action Plaintiffs includes a significant number of such individuals, because the FLSA Named Plaintiffs are informed and believe, and thereon allege that within the three years before the filing of this Complaint Defendant has employed approximately 1,000 franchisees in the State of California, the vast majority of whom are eligible to comprise the group of FLSA Collective Action Plaintiffs. The FLSA Named Plaintiffs further allege that the FLSA Collective Action Plaintiffs were each subjected to the same or similar unlawful practices and policies alleged herein. Each member of this potential group of FLSA Collective Action Plaintiffs must affirmatively consent to join in this action to pursue FLSA remedies alleged herein.

B. This FLSA Collective Action involves common questions of law and/or fact which predominate over individual issues, because the action focuses on Defendant's common employment practices and policies in California applied to the FLSA Collective Action Plaintiffs in violation of the FLSA as alleged herein.

C. The claims of each of the FLSA Named Plaintiffs (and as yet other unnamed representatives) are also typical of the claims of the FLSA Collective Action Plaintiffs because Defendant subjected all of their franchisees to similar and/or identical violations of the FLSA as alleged herein.

D. Each of the FLSA Named Plaintiffs (and as yet other unnamed representatives) are able to fairly and adequately protect and advance the interests of all members of the FLSA Collective Action in one action, because the FLSA Named Plaintiffs are 7-Eleven franchisees in California who have

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

been damaged in a manner similar to other FLSA Collective Action Plaintiffs, and it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to the FLSA Collective Action Plaintiffs for all relief to which they are entitled as a result of Defendant's unlawful policies and practices which violated the FLSA as alleged herein.

**B. Class Action Allegations**

**1. California Overtime Class**

123.   Pursuant to L.R. 23-2.2, Haitayan, Dhillon, Elkins and Purewal (the "California Overtime Class Action Named Plaintiffs") allege this action is appropriately suited for an "opt out" class action under F.R.Civ.P. 23(a)(1)-(4) & (b)(3), as it relates to Counts Two, Five, and Six for violations of overtime laws under the California Labor Code, the California Code of Regulations, and the California Business & Professions Code (a "California Overtime Class Action") against Defendant, because:

A.   Pursuant to L.R. 23-2.2(a), and subject to discovery and potential modifications and/or sub-classes until the time class certification is requested, the California Overtime Class Action Named Plaintiffs propose to represent themselves and all other similarly situated franchisees of Defendant in California—including those individuals who are currently operating as of the date of filing of this Complaint, or who come to operate after the date of the filing of this Complaint, one or more of Defendant's "7-Eleven" franchised retail convenience stores in California under the terms of Defendant's FA—for violations of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code alleged herein for overtime violations (i.e., the "California Overtime Class Action Plaintiffs"). This potential group of such California Overtime Class Action Plaintiffs encompasses franchisees who operate 7-Eleven retail convenience stores either

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

as an individual franchisee or in the name of an entity franchisee, to the extent any such franchisee has personally worked hours that constitute overtime hours under California law. This potential group of California Overtime Class Action Plaintiffs includes a significant number of such individuals, because the California Overtime Class Action Named Plaintiffs are informed and believe, and thereon allege that within the four years before the filing of this Complaint Defendant has employed approximately 1,000 franchisees in the State of California, the vast majority of whom are eligible to comprise the group of California Overtime Class Action Plaintiffs. The California Overtime Class Action Named Plaintiffs further allege that California Overtime Class Action Plaintiffs are a numerous group of persons who were each subjected to the same or similar unlawful practices and policies alleged herein. Because the California Overtime Class Action class may consist of hundreds or more members, joinder of all such persons to pursue the California Overtime Class Action claims would be impracticable.

   B.   There are questions of law and/or fact common to the California Overtime Class Action Plaintiffs, including but not limited to the independent contractor status of all 7-Eleven California franchisees and damages that may be owed to them as a result of Defendant's alleged misclassification, because the action focuses on Defendant's common employment practices and policies in California applied to the California Overtime Class Action Plaintiffs in violation of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code as alleged herein, i.e., Defendant's enforcement of common franchise agreement covenants and incorporated policies and procedures applicable to all franchisees. Each claim depends upon a common contention of such a nature that it is capable of class-wide resolution, i.e. the requested class action has the capacity to generate common answers,

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

which are apt to drive the resolution of the litigation.

C.     The claims of each of the California Overtime Class Action Named Plaintiffs (and as yet other unnamed representatives) are also typical of the claims of the California Overtime Class Action Plaintiffs because Defendant classified the California Overtime Class Action Named Plaintiffs, and all other California Overtime Class Action Plaintiffs, as independent contractors in California, and subjected them to similar and/or identical violations of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code as alleged herein. The claims of the California Overtime Class Action Named Plaintiffs and all other California Overtime Class Action Plaintiffs rise and fall on the same or similar facts, and present the same or similar claims arising from the same course of conduct which gives rise to the same or similar injuries and requests for relief.

D.     Each of the California Overtime Class Action Named Plaintiffs (and as yet other unnamed representatives) are able to fairly and adequately protect and advance the interests of all members of the California Overtime Class Action in one action, because the California Overtime Class Action Named Plaintiffs are 7-Eleven franchisees in California who have been treated as independent contractors and thus damaged in a manner similar to other California Overtime Class Action Plaintiffs, and it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to California Overtime Class Action Plaintiffs for all California Overtime Class Action relief they seek in this action. The California Overtime Class Action Named Plaintiffs do not have conflicts of interest with the California Overtime Class Action Plaintiffs, and all such class members will be represented by qualified and competent class counsel.

E.     This California Overtime Class Action involves common questions

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

of law and/or fact which predominate over issues affecting only individual members, in part because Defendant has classified all 7-Eleven franchisees in California as independent contractors and deprived all class members of the benefits and protections of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code as alleged herein. The issue apt to drive resolution of this litigation, i.e. the misclassification of franchisees as independent contractors and not employees, turns upon the same or virtually the same franchise agreement covenants and incorporated policies and procedures Defendant has established.

F.     An opt out class action would be a superior means to adjudicate the California Overtime Class Action Plaintiffs' claims and Defendant's defenses to these alleged violations, including but not limited to the primary issue of the California Overtime Class Action Plaintiffs' classification as employees or independent contractors of Defendant, which will not be difficult to manage because no materially significant management issues are implicated by the claims and defenses in this action. No other litigation has begun concerning these controversies by or against California Overtime Class Action Plaintiffs. It also would be desirable to concentrate this litigation in a Class Action in this Court because the outcome of the case will have a significant impact on all 7-Eleven franchisees in California.

G.     The California Overtime Class Action Named Plaintiffs contemplate that notice of class certification to the California Overtime Class Action Plaintiffs would be in accordance with F.R.Civ.P. 23(c)(2)(B), through a direct written disclosure mailed to each class member advising of: the nature of the case; the class definition; the class claims, issues and defenses; the right to retain separate counsel or to request exclusion from the certified class within a certain limited time period; and the binding effect of a class judgment.

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

## 2. California Expense Class

124.   Pursuant to L.R. 23-2.2, all six of the Named Plaintiffs allege this action is appropriately suited for an "opt out" class action under F.R.Civ.P. 23(a)(1)-(4) & (b)(3), as it relates to Counts Three through Six for violations of expense reimbursement laws the California Labor Code, the California Code of Regulations, and the California Business & Professions Code (a "California Expense Class Action") against Defendant, because:

A.   Pursuant to L.R. 23-2.2(a), and subject to discovery and potential modifications and/or sub-classes until the time class certification is requested, the Named Plaintiffs propose to represent themselves and all other similarly situated franchisees of Defendant in California—including those individuals who are currently operating as of the date of filing of this Complaint, or who come to operate after the date of the filing of this Complaint, one or more of Defendant's "7-Eleven" franchised retail convenience stores in California under the terms of Defendant's FA—for violations of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code alleged herein for expense reimbursement violations (i.e., the "California Expense Class Action Plaintiffs"). This potential group of such California Expense Class Action Plaintiffs encompasses franchisees who operate 7-Eleven retail convenience stores either as an individual franchisee or in the name of an entity franchisee, to the extent any such franchisee has personally incurred expenses to operate a 7-Eleven store for which Defendant is responsible under California law. This potential group of California Expense Class Action Plaintiffs includes a significant number of such individuals, because the Named Plaintiffs are informed and believe, and thereon allege that within the four years before the filing of this Complaint Defendant has employed approximately 1,000 franchisees in the State of California, all of whom are eligible to comprise

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

the group of California Expense Class Action Plaintiffs. The Named Plaintiffs further allege that California Expense Class Action Plaintiffs are a numerous group of persons who were each subjected to the same or similar unlawful practices and policies alleged herein. Because the California Expense Class Action class may consist of 1,000 or more members, joinder of all such persons to pursue the California Expense Class Action claims would be impracticable.

B.     There are questions of law and/or fact common to the California Expense Class Action Plaintiffs, including but not limited to the independent contractor status of all 7-Eleven California franchisees and damages that may be owed to them as a result of Defendant's alleged misclassification, because the action focuses on Defendant's common employment practices and policies in California applied to the California Expense Class Action Plaintiffs in violation of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code as alleged herein, i.e., Defendant's enforcement of common franchise agreement covenants and incorporated policies and procedures applicable to all franchisees. Each claim depends upon a common contention of such a nature that it is capable of class-wide resolution, i.e. the requested class action has the capacity to generate common answers, which are apt to drive the resolution of the litigation.

C.     The claims of each of the Named Plaintiffs (and as yet other unnamed representatives) are also typical of the claims of the California Expense Class Action Plaintiffs because Defendant classified the Named Plaintiffs, and all other California Expense Class Action Plaintiffs, as independent contractors in California, and subjected them to similar and/or identical violations of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code as alleged herein. The claims of the Named Plaintiffs and all other California Expense Class

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

Action Plaintiffs rise and fall on the same or similar facts, and present the same or similar claims arising from the same course of conduct which gives rise to the same or similar injuries and requests for relief.

D.     Each of the Named Plaintiffs (and as yet other unnamed representatives) are able to fairly and adequately protect and advance the interests of all members of the California Expense Class Action in one action, because the Named Plaintiffs are 7-Eleven franchisees in California who have been treated as independent contractors and thus damaged in a manner similar to other California Expense Class Action Plaintiffs, and it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to California Expense Class Action Plaintiffs for all California Expense Class Action relief they seek in this action. The Named Plaintiffs do not have conflicts of interest with the California Expense Class Action Plaintiffs, and all such class members will be represented by qualified and competent class counsel.

E.     This California Expense Class Action involves common questions of law and/or fact which predominate over issues affecting only individual members, in part because Defendant has classified all 7-Eleven franchisees in California as independent contractors and deprived all class members of the benefits and protections of the California Labor Code, the California Code of Regulations, and the California Business & Professions Code as alleged herein. The issue apt to drive resolution of this litigation, i.e. the misclassification of franchisees as independent contractors and not employees, turns upon the same or virtually the same franchise agreement covenants and incorporated policies and procedures Defendant has established.

F.     An opt out class action would be a superior means to adjudicate the California Expense Class Action Plaintiffs' claims and Defendant's defenses to

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

these alleged violations, including but not limited to the primary issue of the California Expense Class Action Plaintiffs' classification as employees or independent contractors of Defendant, which will not be difficult to manage because no materially significant management issues are implicated by the claims and defenses in this action. No other litigation has begun concerning these controversies by or against California Expense Class Action Plaintiffs. It also would be desirable to concentrate this litigation in a Class Action in this Court because the outcome of the case will have a significant impact on all 7-Eleven franchisees in California.

G.     The Named Plaintiffs contemplate that notice of class certification to the California Expense Class Action Plaintiffs would be in accordance with F.R.Civ.P. 23(c)(2)(B), through a direct written disclosure mailed to each class member advising of: the nature of the case; the class definition; the class claims, issues and defenses; the right to retain separate counsel or to request exclusion from the certified class within a certain limited time period; and the binding effect of a class judgment.

## IV.   <u>CLAIMS</u>

### <u>COUNT ONE:</u>

### FAILURE TO PAY OVERTIME COMPENSATION

### IN VIOLATION OF THE FEDERAL FAIR LABOR STANDARDS ACT

125. This Count One is pled by the FLSA Named Plaintiffs and all FLSA Collective Action Plaintiffs, against Defendant.

126. At all times relevant to this Complaint, and within three (3) years before the commencement of this action, Defendant was and continues to be an employer of the FLSA Named Plaintiffs and FLSA Collective Action Plaintiffs within the meaning of the FLSA. As a result, the FLSA Named Plaintiffs and all FLSA Collective Action Plaintiffs' employment for Defendant is covered and governed by the FLSA, 29

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

U.S.C. sections 201, et seq., inclusive of Section 207, which regulate the payment of overtime wages for hours worked in excess of forty hours per week. The FLSA requires each covered employer, such as Defendant, to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek.

127. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, Defendant employed and continues to employ the FLSA Named Plaintiffs and FLSA Collective Action Plaintiffs in the State of California to operate retail convenience stores owned by Defendant, pursuant to the FLSA. Because the FLSA Named Plaintiffs and FLSA Collective Action Plaintiffs were/are employees of Defendant, Defendant was obligated to comply with the FLSAs overtime pay rules pursuant to 29 U.S.C. section 207.

128. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, the FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs have worked hours for which overtime wages have been owed. As such, the FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs are entitled to be paid overtime compensation for all overtime hours worked. At all times relevant to this Complaint, Defendant had a uniform practice and policy of failing and refusing to pay overtime to the FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs for their overtime hours worked. As a result of the unlawful acts of Defendant in its failure to compensate the FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs for overtime hours worked, Defendant has violated and continues to violate the FLSA, 29 U.S.C. section 201 et seq., including 29 U.S.C. sections 207(a)(1) and 215(a).

129. Defendant's failure to pay the FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs in conformity with the FLSA overtime pay rates was willful within the meaning of 29 U.S.C. § 255(a). By failing to compensate the FLSA

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

Named Plaintiffs and the FLSA Collective Action Plaintiffs for overtime hours, Defendant has violated, and continues to violate statutory rights under the FLSA. The FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs seek and are entitled to recover a monetary judgment in the amount of unpaid wages as provided under the FLSA, 29 U.S.C. section 216(b).

130. The FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs also seek and are entitled to recover a monetary judgment for liquidated damages in an amount equal to overtime pay owed, as provided under the FLSA, 29 U.S.C. section 216(b).

131. The FLSA Named Plaintiffs and the FLSA Collective Action Plaintiffs also seek and are entitled to recover reasonable attorney's fees and costs, and such other legal and equitable relief, including interest, as provided by the FLSA, 29 U.S.C. section 216(b), or as otherwise allowed by law.

132. Each of the FLSA Named Plaintiffs consents to sue in this action pursuant to the FLSA and files concurrently herewith, Consent to Join forms, pursuant to the FLSA, 29 U.S.C. sections 216(b) and 256. It is likely that other of the FLSA Collective Action Plaintiffs will sign consent forms and join as plaintiffs on this claim in the future.

## COUNT TWO:

### FAILURE TO PAY OVERTIME COMPENSATION
### IN VIOLATION OF CALIFORNIA LAW

133. This Count Two is pled by the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs, against Defendant.

134. At all times relevant to this Complaint, and within three (3) years before the commencement of this action, Defendant was and continues to be an employer of the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs within the meaning of California law, California Labor Code

43

sections 18 and 1194, and California Code of Regulations, title 8, section 11070. As a result, the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs' employment for Defendant is covered and governed by the California Labor Code section 1194, and California Code of Regulations, title 8, section 11070, subsection 3, which regulate the payment of overtime wages for hours worked in excess of eight hours per day and forty hours per week. California Labor Code section 1194, and California Code of Regulations, title 8, section 11070, subsection 3 require each covered employer, such as Defendant, to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed: in excess of eight hours in a workday, and forty hours in a workweek, and the first eight hours on the seventh day of a workweek; and double-time for all hours worked in excess of twelve hours in a workday, and after the first eight hours on the seventh day of a workweek.

135. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, Defendant employed and continues to employ the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs in the State of California to operate retail convenience stores owned by Defendant, pursuant to the California Labor Code and California Code of Regulations. Because the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs were/are employees of Defendant, Defendant was obligated to comply with California's overtime pay rules pursuant to California Labor Code section 1194, and California Code of Regulations, title 8, section 11070, subsection 3.

136. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs have worked hours for which overtime wages have been owed. As such, the California Overtime Class Action

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

Named Plaintiffs and all California Overtime Class Action Plaintiffs are entitled to be paid overtime compensation for all overtime hours worked. At all times relevant to this Complaint, Defendant had a uniform practice and policy of failing and refusing to pay overtime to the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs for their overtime hours worked. As a result of the unlawful acts of Defendant in its failure to compensate the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs for overtime hours worked, Defendant has violated and continues to violate California law, including Labor Code section 1194, and California Code of Regulations, title 8, section 11070, subsection 3.

137. Defendant's failure to pay the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs in conformity with California overtime pay rates was willful. By failing to compensate the California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs for overtime hours, Defendant has violated, and continues to violate statutory and regulatory rights under California law. The California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs seek and are entitled to recover a monetary judgment in the amount of unpaid wages as provided under California Labor Code section 1194.

138. The California Overtime Class Action Named Plaintiffs and all California Overtime Class Action Plaintiffs also seek and are entitled to recover reasonable attorney's fees and costs, and such other legal and equitable relief, including interest, as provided by California Labor Code section 1194.

## COUNT THREE:

## FAILURE TO INDEMNIFY FOR EXPENSES AND LOSSES
## IN VIOLATION OF CALIFORNIA LAW

139. This Count Three is pled by the Named Plaintiffs and all California

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

Expense Class Action Plaintiffs, against Defendant.

140. At all times relevant to this Complaint, and within three (3) years before the commencement of this action, Defendant was and continues to be an employer of the Named Plaintiffs and all California Expense Class Action Plaintiffs within the meaning of California law, California Labor Code sections 18 and 2802, and California Code of Regulations, title 8, section 11070. As a result, the Named Plaintiffs and all California Expense Class Action Plaintiffs' employment for Defendant is covered and governed by California Labor Code section 2802, which requires an employer to indemnify its employees for all necessary expenditures or losses incurred by an employee in direct consequence of the discharge his or her duties, or obedience to the directions of the employer.

141. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, Defendant employed and continues to employ the Named Plaintiffs and all California Expense Class Action Plaintiffs in the State of California to operate retail convenience stores owned by Defendant, pursuant to the California Labor Code and California Code of Regulations. Because the Named Plaintiffs and all California Expense Class Action Plaintiffs were/are employees of Defendant, Defendant was obligated to comply with California's business expense laws pursuant to California Labor Code section 2802.

142. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, the Named Plaintiffs and all California Expense Class Action Plaintiffs have incurred necessary expenditures and losses, all in direct consequence of the discharge of their duties to Defendant and in obedience to the directions of Defendant in operating Defendant's 7-Eleven stores. Such expenses have included, but are not necessarily limited to: paying the expenses associated with other employees in the stores; paying for cleaning and maintenance of Defendant's premises and of Defendant's equipment; and paying for expenses associated with store

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

operational supplies (with the exception of any expenses related to store security camera/DVR systems, which are expressly not sought in this action). At all times relevant to this Complaint, Defendant had a uniform practice and policy of failing and refusing to pay for, and to reimburse the Named Plaintiffs and all California Expense Class Action Plaintiffs for these necessary expenditures and losses. As a result of the unlawful acts of Defendant in its failure to indemnify the Named Plaintiffs and all California Expense Class Action Plaintiffs for necessary expenditures and losses, Defendant has violated and continues to violate California law, including Labor Code section 2802.

143. Defendant's failure and refusal to pay for, and to reimburse the Named Plaintiffs and all California Expense Class Action Plaintiffs for these necessary expenditures and losses in conformity with California law was willful. By failing to compensate the Named Plaintiffs and all California Expense Class Action Plaintiffs for necessary expenditures and losses, Defendant has violated, and continues to violate statutory rights under California law. The Named Plaintiffs and all California Expense Class Action Plaintiffs seek and are entitled to recover a monetary judgment in the amount of necessary expenditures and losses as provided under California Labor Code section 2802.

144. The Named Plaintiffs and all California Expense Class Action Plaintiffs also seek and are entitled to recover reasonable attorney's fees and costs, and such other legal and equitable relief, including interest, as provided by California Labor Code section 2802.

## COUNT FOUR:

## FAILURE TO PROVIDE AND MAINTAIN UNIFORMS AND EQUIPMENT IN VIOLATION OF CALIFORNIA LAW

145. This Count Four is pled by the Named Plaintiffs and all California Expense Class Action Plaintiffs, against Defendant.

47

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

146. At all times relevant to this Complaint, and within three (3) years before the commencement of this action, Defendant was and continues to be an employer of the Named Plaintiffs and all California Expense Class Action Plaintiffs within the meaning of California law, California Labor Code section 18, and California Code of Regulations, title 8, section 11070. As a result, the Named Plaintiffs and all California Expense Class Action Plaintiffs' employment for Defendant is covered and governed by California Code of Regulations, title 8, section 11070, subsection 9, which requires that an employer provide and maintain uniforms, tools and equipment required by the employer.

147. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, Defendant employed and continues to employ the Named Plaintiffs and all California Expense Class Action Plaintiffs in the State of California to operate retail convenience stores owned by Defendant, pursuant to the California Labor Code and California Code of Regulations. Because the Named Plaintiffs and all California Expense Class Action Plaintiffs were/are employees of Defendant, Defendant was obligated to comply with California's business expense laws pursuant to California Code of Regulations, title 8, section 11070, subsection 9.

148. At all times relevant to this Complaint, since three (3) years prior to the commencement of this action, the Named Plaintiffs and all California Expense Class Action Plaintiffs have incurred expenses required by their work for Defendant in operating Defendant's 7-Eleven stores. Such expenses have included, but are not necessarily limited to: purchasing, and paying for maintenance of uniforms; paying for maintenance of Defendant's equipment; and paying for other tools and equipment expenses associated with store operational supplies (with the exception of any expenses related to store security camera/DVR systems, which are expressly not sought in this action). At all times relevant to this Complaint, Defendant had a uniform practice and policy of failing and refusing to pay for, and to reimburse the

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

Named Plaintiffs and all California Expense Class Action Plaintiffs for these categories of expenses. As a result of the unlawful acts of Defendant in its failure to indemnify the Named Plaintiffs and all California Expense Class Action Plaintiffs for necessary expenditures and losses, Defendant has violated and continues to violate California law, including California Code of Regulations, title 8, section 11070, subsection 9.

149. Defendant's failure and refusal to pay for, and to reimburse the Named Plaintiffs and all California Expense Class Action Plaintiffs for these necessary expenses in conformity with California law was willful. By failing to compensate the Named Plaintiffs and all California Expense Class Action Plaintiffs for necessary expenses, Defendant has violated, and continues to violate statutory rights under California law. The Named Plaintiffs and all California Expense Class Action Plaintiffs seek and are entitled to recover a monetary judgment in the amount of necessary expenses as provided under California Code of Regulations, title 8, section 11070, subsection 9.

## COUNT FIVE:

### UNFAIR BUSINESS PRACTICES IN VIOLATION OF
### THE CALIFORNIA BUSINESS AND PROFESSIONS CODE

150. This Count Five is pled by the Named Plaintiffs and all Plaintiffs, against Defendant.

151. Defendant engages in business practices, offers goods and services for sale, and advertises goods and services for sale within the State of California. As such, Defendant has a duty to comply with the provisions of the Unfair Business Practices Act as set forth in California Business & Professions Code Sections 17200, et seq., which Act prohibits, inter alia, unlawful, unfair, and/or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising by any person, firm, corporation, or association within the jurisdiction of the State of California.

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

152.   By violating the FLSA and California law as alleged above, and by failing to take immediate and appropriate measures to address these violations, Defendant's acts constitute unfair business practices under California Business and Professions Code sections 17200, et seq. Defendant's foregoing violations of the FLSA and California law, and by extension, California Business and Professions Code sections 17200, et seq., constitute an unfair business practice because the acts have been done repeatedly over a significant period of time throughout the State of California, and in a systematic manner to the detriment of the Named Plaintiffs and all Plaintiffs.

153.   As a direct, foreseeable, and proximate result of Defendant's acts and omissions alleged herein, for the four years preceding the filing of this action, the Named Plaintiffs and all Plaintiffs have suffered damages, and Defendant has also been unjustly enriched as a result of unfair business practices. Named Plaintiffs and all Plaintiffs therefore request restitution of all lost wages and expenses from Defendant in an amount according to proof at time of trial.

154.   Defendant has applied, is applying, and will apply the foregoing unfair business policies and practices to certain of its employees who are still employed, and to certain individuals who will in the future become employed by Defendant. Such employees have been injured and damaged, and are threatened with further injury and damage by Defendant's actions as alleged, and are thus threatened with immediate irreparable harm by the continuation of Defendant's actions as heretofore alleged, and have no complete adequate remedy at law. Therefore, the Named Plaintiffs and all Plaintiffs request the Court enter an order reflecting appropriate injunctive relief to prevent Defendant from committing such acts in the future.

/ / /

/ / /

/ / /

50

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

**COUNT SIX:**

**UNLAWFUL BUSINESS PRACTICES IN VIOLATION OF**

**THE CALIFORNIA BUSINESS AND PROFESSIONS CODE**

155. This Count Six is pled by the Named Plaintiffs and all Plaintiffs, against Defendant.

156.   Defendant engages in business practices, offers goods and services for sale, and advertises goods and services for sale within the State of California. As such, Defendant has a duty to comply with the provisions of the Unfair Business Practices Act as set forth in California Business & Professions Code Sections 17200, et seq., which Act prohibits, inter alia, unlawful, unfair, and/or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising by any person, firm, corporation, or association within the jurisdiction of the State of California.

157.   By violating the FLSA and California law as alleged above, and by failing to take immediate and appropriate measures to address these violations, Defendant's acts constitute unlawful business practices under California Business and Professions Code sections 17200, et seq. Defendant's foregoing violations of the FLSA and California law, and by extension, California Business and Professions Code sections 17200, et seq., constitute an unlawful business practice because the acts have been done repeatedly over a significant period of time throughout the State of California, and in a systematic manner to the detriment of the Named Plaintiffs and all Plaintiffs.

158.   As a direct, foreseeable, and proximate result of Defendant's acts and omissions alleged herein, for the four years preceding the filing of this action, the Named Plaintiffs and all Plaintiffs have suffered damages, and Defendant has also been unjustly enriched as a result of unlawful business practices. Named Plaintiffs and all Plaintiffs therefore request restitution of all lost wages and expenses from Defendant in an amount according to proof at time of trial.

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION,
AND OTHER RELIEF

159.   Defendant has applied, is applying, and will apply the foregoing unlawful business policies and practices to certain of its employees who are still employed, and to certain individuals who will in the future become employed by Defendant. Such employees have been injured and damaged, and are threatened with further injury and damage by Defendant's actions as alleged, and are thus threatened with immediate irreparable harm by the continuation of Defendant's actions as heretofore alleged, and have no complete adequate remedy at law. Therefore, the Named Plaintiffs and all Plaintiffs request the Court enter an order reflecting appropriate injunctive relief to prevent Defendant from committing such acts in the future.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

# V.   **PRAYER FOR RELIEF**

Plaintiffs SERGE HAITAYAN, JASPREET DHILLON, ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA, individually, and on behalf of others similarly situated, pray for judgment as follows:

1.   For nominal damages;

2.   For actual damages;

3.   For compensatory damages;

4.   For restitution of all wages and expenses due to all Plaintiffs;

5.   For interest accrued to date;

6.   For costs of suit and expenses incurred;

7.   For liquidated damages pursuant to 29 U.S.C. section 216(b);

8.   For reasonable attorneys' fees pursuant to 29 U.S.C. section 216(b), California Labor Code sections 1194 and 2802, and California Code of Civil Procedure section 1021.5;

9.   For appropriate injunctive relief;

10.   For appropriate equitable relief;

11.   For all such other and further relief that the Court may deem just and proper.

Respectfully submitted,

Dated: October 12, 2017

**CULP & DYER, LLP**
**RUPAL LAW**

**POPE, BERGER,**
**WILLIAMS & REYNOLDS, LLP**
By: /s/ Timothy G. Williams
Timothy G. Williams
Stephanie Reynolds
Attorneys for Plaintiffs SERGE HAITAYAN, JASPREET DHILLON, ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA, individually, and on behalf of others similarly situated

53

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF

## VI.   **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules Civil Procedure, rule 38(b), and L.R. 38-1, Plaintiffs SERGE HAITAYAN, JASPREET DHILLON, ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA, individually, and on behalf of others similarly situated, demand a jury trial.

Respectfully submitted,
Dated: October 12, 2017

**CULP & DYER, LLP**
**RUPAL LAW**

**POPE, BERGER,**
**WILLIAMS & REYNOLDS, LLP**
By: /s/ Timothy G. Williams
Timothy G. Williams
Stephanie Reynolds
Attorneys for Plaintiffs SERGE HAITAYAN, JASPREET DHILLON, ROBERT ELKINS, MANJIT PUREWAL, and MANINDER "PAUL" LOBANA, individually, and on behalf of others similarly situated

PLAINTIFFS' COMPLAINT FOR DAMAGES, RESTITUTION, AND OTHER RELIEF