James F. Speyer (SBN 133114)
James.Speyer@arnoldporter.com
ARNOLD & PORTER
KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Tel: (213) 243-4000 / Fax: (213) 243-4199

Norman M. Leon (*pro hac vice*)
Norman.Leon@dlapiper.com
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
Tel: (312) 368-4000/Fax: (312) 236-7516

Matthew D. Grant (*pro hac vice*)
Matthew.Grant@arnoldpoter.com
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Tel: (213) 836-8000 / Fax: (212) 836-8689

Matthew J. Iverson (*pro hac vice*)
Matthew.Iverson@dlapiper.com
DLA Piper LLP (US)
33 Arch Street
Boston, MA 02110
Tel: (617) 406-6000/Fax: (617) 406-6100

Attorneys for Defendant 7-Eleven, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SERGE HAITAYAN, JASPREET DHILLION, ROBERT ELKINS, AND MANINDER "PAUL" LOBANA, individually and on behalf of others similarly situated.,

Plaintiff,

v.

7-ELEVEN, INC., a Texas corporation,

Defendant.

CASE NO.  2:17-CV-7454-DSF-ASX
CASE NO.  2:18-CV-5465-DSF-ASX

**DECLARATION OF FRANCINE LAFONTAINE**

Date:    March 23, 2021
Room:    7D
Judge:   Hon. Dale S. Fischer

1.     My name is Francine Lafontaine.  I am the Associate Dean for Business + Impact, and the William Davidson Professor of Business Economics and Public Policy, at the Ross School of Business at the University of Michigan.  I am also Professor of Economics (courtesy) at the University of Michigan's Department of Economics.  Previously, I served for 4.5 years as the Senior Associate Dean for Faculty and Research at the Ross School of Business at the University of Michigan,

from January 2016 to June 2020.  I make the following statements in support of Defendant 7-Eleven's case at trial.

### Qualifications

2.     My academic research is in the field of economics called Industrial Organization. Within Industrial Organization, my research is particularly focused on several related topics: vertical relationships (e.g., contracting arrangements between manufacturers of products and distributors/retailers that sell their products), franchising (a specific form of a vertical relationship), and entrepreneurship.  My research is mostly concerned with the application of advances in contract theory to the analysis of franchising arrangements and other vertical restraints more generally. I also study the effect of contracting practices on firm performance, related competition policy issues, and issues surrounding business creation and survival in retail and small-scale service industries.

3.     From Fall 2014 to the end of 2015, I served as Director of the FTC's Bureau of Economics.  In that role, I helped analyze a variety of regulatory and enforcement questions related to competition policy, including questions related to franchising, vertical relationships, and the effects of franchising and vertical relationships on competition.

4.     I have published many papers in peer-reviewed academic journals that address economic questions related to franchising and vertical contracts.  I have also co-authored, with Roger Blair at the University of Florida, a book titled The Economics of Franchising, which details the core economic principles that apply to the analysis of franchising and vertical relationships.  Additionally, I am currently a co-editor of the Journal of Economic and Management Strategy and have previously been a co-editor of the Journal of Law, Economics, and Organization, and served in other editorial roles at other journals.  In those roles, and as a referee, I have regularly reviewed academic papers submitted for publication in academic journals. Exhibit 247 is a true and accurate copy of my curriculum vitae.

AFFIDAVIT OF FRANCINE LAFONTAINE

5.      I am being compensated at my standard billing rate of $900 per hour for my work in this matter.  I have been assisted in this matter by others, including staff of Cornerstone Research, who worked under my direction.  None of my compensation in this matter is in any way contingent or based on the content of my opinion in this or any other matter or the outcome of this or any other matter.

### The Economics of Franchising

6.      In general, there is a continuum of business relationships that a firm can establish with its potential retailers and suppliers, ranging from discrete arms-length contracting on one end of the continuum to full integration, involving employment relationships, on the other.  Economists refer to these different types of relationships as "vertical relationships" because they connect different "vertical" levels of the production process – e.g., input supplier, manufacturer, distributor, and retailer

7.      My testimony focuses on one specific type of vertical relationship on this continuum, franchising.  Franchising differs from the business relationships on the two poles in ways that provide significant efficiencies.  Indeed, franchising's unique nature becomes obvious when one examines the alternatives at each end of the continuum.  In order to understand the franchising model, it is therefore helpful to first examine the alternative relationships at each end of the continuum

*i.      The Continuum of Vertical Relationships*

8.      At one end of the continuum of business relationships is discrete arms-length contracting.  In discrete contracting, product creators (or manufacturers) sell their products to retailers or distributors through spot (or discrete) contracts.

9.      These transactions are straightforward exchanges of money for title. After the manufacturer has sold the product to the retailer (i.e., the relationship is consummated), the buyer (retailer) is free to sell the product to consumers in any way it sees fit, and the seller (manufacturer) is free to sell other units of the product to any other buyer.  For example, a supermarket may contract to purchase a load of eggs from a local farm with a popular brand in its local market on a one-off basis.

AFFIDAVIT OF FRANCINE LAFONTAINE

The eggs are delivered, the supermarket pays the farm, and no further orders are anticipated. These contracts are temporary, have a clear beginning and a clear end, and there is no need for, or expectation of, a continuing relationship between buyer and seller.

10.     The discrete contracting model's primary advantages when it comes to organizing distribution are its efficiency from specialization and its flexibility, as both manufacturer and retailer need only invest in the type of business in which they specialize, and if they no longer want to sell to or buy from the other party, they can simply walk away and find an alternative.

11.     The main disadvantages of discrete contracting are that it gives the manufacturer and retailer no control over the other party's behavior and impact on each other's brands, and it provides no guarantee of product availability. Because there is no continuing contractual obligation beyond the sale itself, if a manufacturer feels that a retailer's poor sales practices are hurting its brand image with consumers, or if a retailer feels that the manufacturer is hurting the retailer's brand image by providing poor quality products, neither has any recourse except to stop contracting with the other. In fact, because each party knows that the other might suddenly decide to end the relationship, neither has any incentive to invest in the relationship.

12.     For example, in a discrete contracting arrangement between a farm and a supermarket, the farm has no direct control over any aspect of brand value other than initial product quality. Thus, the retailer, for example, might not store the eggs to ensure their freshness, and/or might keep selling these branded eggs beyond their freshness date. The farmer cannot depend on the retailer to buy its eggs on the following day and the retailer cannot depend on the farmer to provide eggs to this particular retailer.

13.     On the other end of the continuum is what is called full vertical integration. In the fully integrated model, the manufacturer owns and operates its

own retail and distribution outlets.  This arrangement gives the manufacturer complete control over the way its products are made available to customers and provides the greatest level of protection for its brand.  That is, it eliminates the incentive problem described in the discrete contracting case above, whereby the retailer lacks incentives to invest in promoting the quality of the manufacturer's brand, or may even take actions that reduce the quality of the product sold to consumers (for example, selling products that are no longer fresh), because the relationship is short term and uncertain.  Vertical integration also gives the manufacturer ownership of the profits derived from the value created at both the manufacturing and distribution levels of the channel.

14.     The main downside of the fully integrated model is that it requires significant investment in organizational structure, and in human and knowledge capital, to create and operate.  Manufacturers would have to develop strong retail capabilities to compete in the retail market.  This is not typically a core competency for the manufacturer, so most manufacturers cannot run a retail business as efficiently as would a firm specializing in retailing.  Moreover, employment-based incentives for managers of retail shops, even those tied to shop performance, are inherently weaker than the incentives created by ownership.  So, if the manufacturer chooses to fully integrate, it must accept that the economic benefits of avoiding the limits of arms-length sales will be at least partially offset by the employed manager's reduced incentive to work hard, to assess and adapt to local conditions, and so on.  Page 6 of Exhibit 250 is an illustration of the continuum of vertical relationships firms establish with distributors, and it is reproduced below:

*Exhibit 250, Page 6*
*There is a continuum of vertical relationships that a firm can establish with distributors*

**Increasing degree of integration**

**Discrete, arms-length contracts**

- Retailer purchases products from manufacturer one transaction at a time, and then sells independently.
- Manufacturer has no guarantee that retailer will invest in, and uphold the quality of, the manufacturer's brand.
- Retailer has no guarantee of product availability.

**Full integration – employment relationships**

- Manufacturer owns all levels of distribution....
- ... but manufacturer must invest in and run entire retail network -- high cost.
- Not always practical, e.g., if consumers want to purchase basket of goods.

ii.    *Franchising's Place on the Continuum*

15.    In the U.S. economy, there are many distribution relationships that fall somewhere between the two poles of this continuum.  Most distribution channels have some relational elements within them (e.g., some expectation of continued interactions, invoice adjustment procedures, etc.), and these arrangements can be either contractual (explicit) or more informal (implicit).  However, when there is an expectation for a continued, long-term exchange between two parties and a need for specific investment to fully achieve the fruits of those exchanges, something more formal is needed.  This usually takes the form of a written contract that describes the terms of trade, and also imposes various restrictions and obligations on the parties, many of which are referred to by economists as "vertical restraints."  Page 7 of Exhibit 250, reproduced below, illustrates this point.

AFFIDAVIT OF FRANCINE LAFONTAINE



*Exhibit 250, Page 7*
**There are many distribution relationships that fall between the two extremes of the continuum**

16.     Franchising is a common intermediate form of distribution involving long-term contracting and vertical restraints that has evolved to meet the needs of retailers and manufacturers alike.  This form of organization blends many of the efficiencies of the discrete contracting business model with many of the brand protections available under the fully integrated business model.  There are two main forms of franchising: product franchising (e.g., automobile dealerships, gasoline retailing, and soft-drink distribution), and business format franchising (e.g., convenience stores like those operated by 7-Eleven franchisees, restaurants, hotels, gyms, copy centers, and tax preparation offices).  Like the discrete contracting model discussed above, both forms of franchising involve financial interactions between two parties.  However, unlike the discrete contracting model, in franchising there is a clear expectation for a continuing relationship that creates a level of interdependence between the parties.  Page 9 of Exhibit 250, reproduced below, summarizes these points.

*Exhibit 250, Page 9*
*Franchising involves long-term contracting and vertical restraints*

| Two main forms of franchising |
| --- |

| **Product Franchising** | **Business Format Franchising** |
| --- | --- |
| Examples:<br>• Automobile dealerships<br>• Gasoline retailing<br>• Soft-drink distribution | Examples:<br>• Convenience stores<br>• Restaurants<br>• Hotels |

Unlike discrete contracting, franchising involves the goal of a continuing relationship and interdependence between the two parties.

For example, the average duration of franchising contracts is 10–15 years.

17.     In product franchising, the franchisee purchases a license to sell products that are manufactured (or procured) and branded by the franchisor. Fundamentally, a product franchising relationship is a form of contractual relationship between a manufacturer and a distributor.  A manufacturer, like a product franchisor, creates a branded product, while a distributor, like a product franchisee, purchases that product for resale to consumers.

18.     In business format franchising, the franchisor creates a branded concept or method of operation and licenses that concept or method to its franchisees. Unlike product franchising, therefore, the primary commodity exchanged between a franchisor and a franchisee in a business format franchise relationship is not a tangible product intended for resale to a consumer, but a license to use the brand as an enhancement to the franchisee's business, along with support for the operation of a proven business format (including training, advertising, pricing, etc.).  In many respects, a business format franchise relationship is similar to a situation in which a business leases industrial machinery or office electronics to enhance its productivity. Like a business that leases productivity enhancements, a franchisee purchases a

AFFIDAVIT OF FRANCINE LAFONTAINE

license from a business format franchisor not because she intends to resell that license to a consumer, but because the license will make the franchisee's business run more profitably.  In other ways, business format franchising also parallels the business model of advertising and consulting firms.  Such professional service firms sell their expertise to independent firms in order to help them more effectively advertise, market, and/or run their business operations.

19.     Franchising arrangements are typically characterized by long-term licenses that require the franchisee to operate their business in a manner that supports the value of the brand.  Franchise agreements also typically extend over a period of several years, allowing for continuity in the exchange relationship.

20.     The franchise business model allows franchisors to monetize their brand and intellectual property in a way that preserves the powerful performance incentives associated with individual ownership.

21.     In turn, the fee structure and long-term licenses inherent in franchising provide franchisees with security that the brand access they purchase will likely retain its value.  Because of the fee structure in these contracts, the franchisor's income is derived from its ability to protect and promote the brand.  Thus, as I detail further below, the franchisor's central business focus is the maintenance of the brand's strength, which includes ensuring that all franchisees do the same.  This incentive structure is valuable to the franchisee, because it gives the franchisee assurances that the franchisor will not abandon the franchise or allow the brand's value to erode, a point I return to in Section 0.

### iii.     *Franchising's Importance in the Economy*

22.     Given the many benefits to both franchisor and franchisees, it is not surprising that a substantial volume of commerce flows through the franchising model in the U.S. economy.  As of the date of the latest available census data, franchising was estimated to account for 7.3 million jobs in the U.S. and total economic output worth $1.3 trillion.  According to the Bureau of Statistics, the

1  number of jobs in franchising is similar to the number of jobs in some rather large

2  sectors of the economy, such as wholesale trade (5.9 million), financial activities

3  (8.6 million), and construction (7.3 million).  In California, for the sectors of full-

4  service and limited-service restaurants alone, business format franchising involves

5  economic output of over $17 billion and close to 330,000 jobs.  Page 10 of Exhibit

6  250, reproduced below, illustrates these points.

7

8  *Exhibit 250, Page 10*
   *Franchising accounts for a substantial portion of the U.S. economy*

9





19  23.      Within certain sectors, franchising captures a large share of industry

20  employment and output.  For example, based on economic census data from the

21  U.S. Census Bureau, in 2012, about 54 percent of all fast-food (limited-service)

22  restaurants in the United States were franchises, representing about 70 percent of all

23  sales of fast-food restaurants ($185.4 billion) and about 73 percent of the

24  employment at fast-food restaurants (3.6 million).  In the convenience store industry

25  – which is a key focus of this report – nearly 15 percent of all convenience stores in

26  the United States were franchises, representing about 25 percent of all sales at

27  convenience stores, and about 24 percent of the employment at convenience stores.

28  Page 11 of Exhibit 250, reproduced below, summarizes these figures.

AFFIDAVIT OF FRANCINE LAFONTAINE

*Exhibit 250, Page 11*
*Franchising captures a larger share of employment and output in various industries*

For example, franchising captures a large share of employment and output for the restaurant and convenience store sectors:

| | Share of Businesses Operated as Franchises | Share of Sales from Franchises | Share of Employment from Franchises |
|---|---|---|---|
| 1. Fast-Food Restaurants | 54% | 70% ($185 Billion) | 73% (3.6 Million) |
| 2. Convenience Stores | 15% | 25% ($5.7 Billion) | 24% (27,000) |

24.     Given its economic importance, it is not surprising that franchising is regulated at the federal level by the Federal Trade Commission ("FTC") and also at the state level in ways that recognize the unique nature of franchising.  Because the franchisees are making an investment when they buy a franchise, the FTC regulates the disclosures made to prospective franchisees as a form of consumer protection prior to purchase.  See Federal Trade Commission, 16 C.F.R. Parts 436 and 437, "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunities; Final Rule," March 30, 2007, pp. 15,444–15,445.

### The Economics of Business Format Franchising

25.     As noted above, the 7-Eleven business model constitutes a form of business format franchising.  Further, many nationally-recognized names in the convenience or fast food industries – including, for example, McDonald's, Burger King, Dunkin' Donuts, Subway, and Circle K – are business format franchisors.  I note that 7-Eleven itself, in its Franchise Disclosure Document, describes its business system as a "business system that includes: a license to use the service mark '7-Eleven'; training; continuing advice and assistance on operating a store; bookkeeping services; store inventory auditing; financing; merchandising assistance; advertising; and other services."  Trial Declaration of Arron Yount ¶ 14.

26.     In a successful business format franchise system, franchisees purchase licenses (i.e., affiliate with franchised chains) because these licenses are valuable to the franchisees' operation.  Business format franchising, thus, differs from product franchising in an important way – the franchisee is not distributing a product for the franchisor, it is actually buying a service from the franchisor (i.e., the know-how and expertise of running the franchisor's retail business), and then building its own business.

27.     Franchisees derive at least three types of value from their franchise agreements relative to being an independent business owner: (1) brand equity, which represents the ability of the franchisor's brand to draw customers to the franchisee's retail business; (2) access to economies of scale or bulk purchasing economies; (3) system access, which refers to the franchisee's ability to benefit from the franchisor's intellectual property (as embodied in the business concept) and know-how to create and operate a retail business with a pre-established track record of profitability. Page 13 of Exhibit 250, reproduced below, summarizes these points.

---

*Exhibit 250, Page 13*
*Business format franchisors create a branded concept and method of operation and license it to franchisees*

In business format franchising, the primary commodity exchanged between franchisor and franchisee is not a tangible product (e.g., TVs), but instead the business model.

| Franchisees pay for: | | |
|---|---|---|
| **1. BRAND EQUITY** | **2. SYSTEM ACCESS** | **3. ECONOMIES OF SCALE** |

---

28.     Using these benefits, franchisees operate their business and create an associated income stream with significant upside – particularly relative to being an employee-manager of a vertically integrated retail outlet.  Franchisees can increase the size of this income stream and earn a greater return on their investment by increasing the business profitability, and ultimately develop equity in the value of the franchise at that location that can be sold to other franchisees.  Furthermore, franchisees can increase their earnings by expanding the scope of their operations: they can own multiple stores within a franchise chain.  The franchise model therefore creates advantages for franchisees over both independent operations, in which independent business owners lack the economies of scale and established business concept that the franchised system provides, and over employees, who typically have no property rights in the profits or equity associated with the business.

   i.     *Benefits for Franchisee: Brand Equity*

29.     "Brand equity" is the term used for the ability of a brand to impact demand and price.  Brand equity also refers to the degree of customer loyalty or stickiness to a particular brand over time.  When a franchisee places a 7-Eleven sign on its retail outlet, it is communicating to potential customers that this store is operating in a manner and providing an assortment that the consumer understands and values.  As 7-Eleven points out on its franchise marketing website, "[w]hen you franchise with 7-Eleven, you become part of a brand that's recognized around the world."  See Exhibit 245 at 2; Trial Declaration of Arron Yount ¶ 8.   An independent retailer, in contrast, can only benefit from the brand equity that it creates for itself, rather than from a broader system of stores with an established brand and reputation.

30.     7-Eleven's brand value is significant.  7-Eleven has been recognized as having one of the most valuable brands in the U.S. – The 7-Eleven brand was ranked the 72nd most valuable in the U.S. in 2019, valued at an estimated $8.6

billion by BrandZ's Top 100 Most Valuable U.S. Brands, a recognized authority in brand valuation.  In addition, for the years ending December 31, 2018 and December 31, 2019, 7-Eleven's independent auditors valued 7-Eleven's goodwill at more than $4.7 billion and $4.9 billion respectively.   See Exhibit 251 at E-21; Exhibit 252 at E-26; Trial Declaration of Arron Yount ¶¶ 12-13, 15.

31.     Brand equity is often associated with a capacity to charge a price premium; the higher the brand equity, the greater the price the product or service might command relative to competing products or services.  For example, a consumer is likely to pay more for a can of Coca-Cola than she would for a can of a generic cola.  This has to do with the relative preference for the brand in the choice process.

32.     Brand equity evolves over time.  It can be increased or maintained through marketing and quality control, or it can be eroded if the owner of the brand does not pay enough attention to it.  In the context of franchising, brand equity can suffer if either the franchisor or a sufficient number of franchisees shirk their responsibilities such that the product's quality or customer experience slips, and customers cease to value the brand as much as they did before.  Accordingly, part of the value that a franchisee purchases when it enters into a franchise agreement is the franchisor's commitment to expend money and effort maintaining and enhancing the brand's value over the life of that franchise agreement.  This commitment typically includes efforts by the franchisor to advertise the brand, police the franchise system, enforce quality standards across all franchisees, and spend monies for brand development and system quality control.  I note that 7-Eleven's Franchise Agreement contains requirements for "maintaining the Store, 7-Eleven Equipment, other property in the Store and landscaped areas in a clean, attractive, orderly, safe, and sanitary condition" and to comply with 7-Eleven's "shelf life requirements with respect to fresh foods."  See Exhibit 251 at F-12, F-17.  Page 14 of Exhibit 250, reproduced below, illustrates these points.

*Exhibit 250, Page 14*
*Benefits for franchisees: brand equity*



Brand equity evolves over time:

» Increased through marketing and quality control.

» Eroded by poor product quality and negative customer experience.

33.     In summary, sharing in the franchisor's brand equity has two overall effects for the franchisee: increasing consumer preference for the franchisee's offering and creating the potential for a price premium.  Both of these effects drive up the revenue that a franchisee might expect as compared to operating a similar business independently, but both of these effects depend on the franchisor's long-term efforts to invest in brand maintenance and enhancement activities, including policing the system's franchisees to protect and maintain quality across the entire system.  Investment and maintenance of the brand value are critical services that franchisees purchase from the franchisor via the payment of upfront fees and royalties.

*ii.     Benefits for Franchisee: Economies of Scale*

34.     In addition to providing value through brand equity, franchisors also typically generate value for franchisees by creating system-wide economies of scale that give their franchisees an economic advantage over their competitors.  In other words, franchisors create value at the system level (i.e., across the scope of the

1    entire franchise network) via purchasing or negotiating sourcing agreements

2    whereby franchisees obtain benefits of bulk purchasing.

3        35.    A primary benefit to franchisees of these economies of scale is that

4    they can further enhance the value of the brand.  For example, franchise systems

5    typically aggregate marketing dollars from the entire franchise system, which

6    permits the purchase of media advertisements for the brand at large volume

7    discounts.  Because they use the franchise system's brand and trademarks, each

8    individual franchisee benefits from these volume discounts in advertisements and

9    gains the benefit of this economy of scale for its local business.

10       36.    In other cases, the economies of scale created by the franchisor have a

11   more direct effect on the franchisees' bottom line.  For example, because of their

12   volume bargaining power, franchisors can secure system-wide bulk contracts for

13   products and raw materials at prices that individual retailers would not be able to

14   secure.  These scale economies allow franchisees to achieve lower operational costs

15   than do independent retailers.  7-Eleven specifically markets these economies of

16   scale, what it refers to as "super buying power," to prospective franchisees on its

17   franchise marketing website.  See Exhibit 257 at 2.  I also note that: (a) Arron

18   Yount, 7-Eleven's Director of Franchising, has testified that 7-Eleven franchisees

19   gain access to 7-Eleven's negotiated pricing discounts with suppliers, which enables

20   7-Eleven franchisees to maintain higher profit margins than their independent

21   competitors, see Trial Declaration of Arron Yount ¶ 7, and (b) Doug Rosencrans, 7-

22   Eleven's Senior Vice President for US Operations, has described how 7-Eleven

23   leverages its buying power to enter into favorable purchasing agreements with

24   certain vendors, see Trial Declaration of Doug Rosencrans ¶ 16.

25       37.    Franchisees also benefit from economies of scale in the sense that being

26   part of a larger franchise system disperses risks and costs throughout the entire

27   system.  For example, if an independent business wants to experiment with new

28   inputs, new product assortments, or new procedures, it must bear the entire cost of

the experiment's implementation and the full risk of loss if the experiment is a failure. A franchisor, in contrast, can test ideas in targeted local markets of interest, then share the learning with individual franchisees, thereby spreading the costs and risks of innovation across the entire system. One means that franchisors often use to do this is to maintain a number of non-franchised (i.e., company owned and operated) locations. This practice is quite common. Well-known business format franchisors that maintain company-owned locations include McDonald's, GNC, Circle K Convenience Stores, On-The-Run Convenience Stores, and Sunoco APlus Convenience Stores. Franchisors use these locations, among other things, as test-beds for new products and procedures before rolling out those new products and procedures to their franchise networks. This way the network's franchisees (unlike independent businesses) get to spread and reduce the error cost associated with failed ideas. Page 16 of Exhibit 250, reproduced below, summarizes these benefits.

*Exhibit 250, Page 16*
*Benefits for franchisees: economies of scale*



Franchisors create system-wide economies of scale that give franchisees an economic advantage over competitors.

System-wide benefits flow to individual franchisees

iii.     *Benefits for Franchisee: System Access*

38.    The franchisor's intellectual property is embodied in an operational system comprised of a tested set of procedures that, if followed, produce an efficiently run business.  Purchasing a franchise allows the franchisee access to this proven system, usually through an operations manual, training, and ongoing support. Both the declaration of Arron Yount and 7-Eleven's Franchise Disclosure Document confirm that 7-Eleven provides these forms of know-how and support.  See Trial Declaration of Arron Yount ¶¶ 5-7, 10; Exhibit 251 at 33-35.  The operational efficiency derived from this know-how and support lowers the franchisee's costs of doing business as compared to operating a similar business independently.

39.    The operations manual acts as a detailed reference guide for the various procedures and standards that make up the franchisor's business concept. Essentially, it is the codification of the franchisor's know-how that allows a franchisee to replicate that concept.  Franchisors update their manual over time as their procedures and standards evolve.

40.    Franchisors usually provide a course of initial training to give the franchisee (and some of the store managers) the skills necessary to execute the business concept set forth in the manual.  Training might be conducted at or close to the franchisees' locations, at a central training facility (e.g., McDonald's Hamburger University), or, often, a combination of the two.  Typically, this initial training is included in the price of the franchise rights, although many systems require the franchisee to bear the cost of travel and lodging during the training period.  The course will include operational training in the specific service that the franchise offers (many franchisors require no prior experience in the type of business involved) and business training in such things as sales, employee management, and system-specific accounting and revenue reporting procedures.

41.    Ongoing support includes both formal and informal consultation to assist the franchisee.  This consultation may take the form of assistance to the franchisee to overcome unforeseen obstacles, but it also includes updates concerning

the development and improvement of the brand concept, standards and procedures. The support process typically includes something as formal as a franchisor field force that visits the franchisee's operations on a regular basis, evaluating and critiquing the performance of the franchisee and offering advice (e.g., on how to improve if the franchisee's numbers are not where they should be). 7-Eleven employs a large field force for exactly this purpose. See Trial Declaration of Arron Yount ¶ 6. Alternatively, it may consist of access to someone to call when facing an unexpected problem. Formal consultation typically also includes a policing function, designed to protect the value of the brand for all franchisees with sanctions on franchisees who violate system standards. The level of policing will depend on the type of franchise.

42.     Taken together, the operations manual, the training the franchisor provides, and the ongoing support the franchisee receives all confer value to the franchisee – paid for by upfront fees and royalties – by lowering costs and creating a profit stream greater than what it could expect from operating an independent business. This profit stream provides the franchisee with a return on the franchisee's investment in the franchise over the life of the agreement. This process is illustrated in Page 15 of Exhibit 250, reproduced below.

AFFIDAVIT OF FRANCINE LAFONTAINE

*Exhibit 250, 15*
*Benefits for franchisees: system access*

A franchisor's intellectual property includes the operational system that allows franchisees to reduce costs and boost revenues.



43.     Put another way, part of what a franchisee receives in exchange for its franchise investment and ongoing fees is an economic advantage over its competitors.  The advantage rests in part on the franchisor's research, development and know-how.  An independent business person without this access must discover which procedures work and which do not through trial and error.  Not only are errors wasteful, but if an independent business owner makes too many of them, the business may fail.  The risks of experimentation are attenuated for a franchisee.

*iv.     Benefits for Franchisee: Upside in Profits and Equity*

44.     In addition to adding value for the franchisee's business relative to independent business ownership as discussed above, purchasing a franchise provides financial benefits directly to the franchisee as compared to being an employee-manager of a store location.  In short, because the franchisee has claims to the profits of the franchised business, the franchise provides the franchisee with an income stream that has significant upside (and potential downside too).  A franchisee can increase the size of this income stream and earn a greater return on investment by increasing the business's profitability.  In particular, in a typical

AFFIDAVIT OF FRANCINE LAFONTAINE

franchise agreement (such as the one used by 7-Eleven), the franchisee earns all of the extra profits produced from a reduction in operating costs.   This differs significantly from an employee-manager of a vertically integrated retail outlet, who would typically be paid a salary.

45.     Likewise, a franchisee owns an alienable long-term contractual license to use the franchisor's business concept in a particular location.  The value of this license increases with the profitability of the franchisee's business, and this increased value gives the franchisee business equity that the franchisee can monetize by selling the business to a third party.

46.     7-Eleven's own data highlight the substantial magnitude of the potential upside in a franchisee's earnings relative to an employee-manager. According to 7-Eleven's records and testimony, the net profits (also referred to as total income) and number of stores of named Plaintiffs in 2016 (rounded to the nearest dollar) were: Serge Haitayan owned one store and earned profits of $31,899, Jaspreet Dhillon owned one store and earned profits of $37,956, Robert Elkins owned two stores and earned profits of $181,954, and Maninder "Paul" Lobana owned three stores and earned profits of $270,717.  See Trial Declaration of Davina Stevens ¶ 26.  The average compensation for Store Managers at corporate-owned 7-Eleven stores in 2016 in California was $48,998. See Trial Declaration of Arron Yount ¶ 24.  In other words, the franchisees, as business owners, had the potential to earn profits up to 5.5 times as much as a typical store manager's salary. In a number of situations, store profits may not be a perfect measure of the franchisees' net earnings for the purposes of comparing those earnings to the compensation of an employee-manager. For example, franchisees may pay themselves a salary for their role as managers, or they may hire and overpay household members, which would result in lower reported store profits, but still be a financial benefit to the franchisee.

47.     These data also show there is real downside risk for the franchisee. The existence of such downside risk captures a fundamental tradeoff in the decision

to be a franchisee or an employee-manager – the franchisee takes on more risk, which includes potential downside risk, than an employee-manager.  However, in return, the franchisee also has access to a very large financial upside if the business is successful.  Page 18 of Exhibit 250, reproduced below, summarizes the different cost and benefits of being a franchisee, as opposed to an employee-manager.

*Exhibit 250, Page 18*
*Franchisees face different costs and benefits relative to being an independent business owner or an employee-manager*

| Compared to independent business owners | Compared to employee-managers |
|---|---|
| • Franchisees can leverage brand value and system-wide economies of scale:<br>» Increase return on investment.<br>» Grow equity value of franchise, which can be sold.<br>• Franchisees bear risk as business owners but risks may be lower thanks to the system, brand etc. | • Franchisees have a claim to the business's profits or equity:<br>» Benefit from the upside from their managerial effort.<br>» Can expand operations to own multiple stores.<br>• Franchisees bear more downside risk than employee-managers. |

<u>Summary of Franchising</u>

48.     To sum up, when the creator of a branded business concept (or product or service) wants to monetize its creative activity (or product or service), it can choose from a wide range of distribution models (i.e., vertical relationships) in which it can be more, or less, involved in the distribution of its product to consumers.  Franchising is a "hybrid" model of distribution that is very common in the U.S. economy, representing a substantial amount of employment and GDP in general, and a large share of employment and GDP in particular sectors.

49.     Franchising's popularity stems from the fact that it combines some of the efficiencies and benefits of the two extreme versions of distribution – discrete

contracting and vertical integration.  In particular, the franchisor can focus its energy and resources on protecting and further developing the intellectual property comprising the branded system along with growing this system, while the franchisees can focus all of their energy and resources on executing the system in a way that maximizes the value of their investments.

50.     Business format franchising – the type of franchising that 7-Eleven engages in – is a distinct form of franchising in which the franchisee is not simply distributing a set of products that the franchisor developed and sells to its franchisees.  Rather, business format franchisees pay for access to an established business model that includes the "know-how", the support, and the established brand of the franchisor.  In exchange, they have the opportunity to develop their own business within that format.  These points summarized on page 20 of Exhibit 250, reproduced below:

---

*Exhibit 250, Page 20*
*Summary of the economics of franchising*

- Creators of branded businesses have varying degrees of involvement in the distribution of their product or service.
  - » Franchising is a "hybrid" distribution model that represents a substantial amount of employment and economic output in the U.S.

- Franchising combines efficiencies from discrete contracting and vertical integration.
  - » Franchisor focuses on protecting and further developing the intellectual property of the branded system and on growing the system.
  - » Franchisees focus on executing the operational system to maximize profitability at their location.

- Business format franchisees pay to access an established business model that includes the "know-how," support, and established brand of the franchisor.

---

### The Relationship Between 7-Eleven And Its Franchisees

i.     *Franchisees Pay Franchisors For The Franchisors' Services*

---

AFFIDAVIT OF FRANCINE LAFONTAINE

51.    In a standard employer/employee relationship, the employer pays the employee money in exchange for the employee's services.  As should be apparent from the preceding discussion of franchising, however, this is not how the relationship between a business format franchisor and a franchisee works and, specifically, it is not the nature of 7-Eleven's relationship with its franchisees.  As discussed above, in a business format franchise relationship, a franchisor provides its franchisees with a license to use the franchisor's branded business concept (whose value the franchisor commits to protect), as well as its intellectual property that is embodied in the operational training and ongoing operational support.  In return, the franchisees pay the franchisor money and promise to operate their businesses in a manner consistent with brand standards.  In other words, in a franchising relationship, the franchisor provides services to its franchisees in exchange for payment, not the other way around.  This is illustrated on page 23 of Exhibit 250, reproduced below:

*Exhibit 250, Page 23*
*In business format franchising, the flow of money and services is reversed from standard employer-employee relationships*



AFFIDAVIT OF FRANCINE LAFONTAINE

52.   7-Eleven's relationship with its franchisees conforms to the standard business format franchise model.  In the franchise agreement (I use Exhibit 161 as an example), 7-Eleven details a variety of services it provides to the franchisees to help leverage 7-Eleven's brand and successfully execute their business.  For example, the franchise agreement requires 7-Eleven to provide the franchisee with a license to operate a 7-Eleven store using 7-Eleven's marks and the 7-Eleven-System (sections 7 and 23), and provide the franchisee with training (section 4).  It also requires 7-Eleven to provide a variety of other services to the franchisee, including help setting up a new franchisee's location, such as with choosing among real estate options and planning store build-out and equipment installation (section 8); back-office systems for operations such as payroll processing, invoice payments and taxes and store audits (sections 12 and 14); and advertising (section 22).  In addition, according to Arron Yount, 7-Eleven employs over 3,500 people to provide all of its franchisees with business consulting support, advice on product selection, store conditions, customer service and other factors that drive sales.  See Trial Declaration of Arron Yount ¶ 6.

53.   In return (again, using Exhibit 161 as an example), the franchisee promises to maintain brand standards (sections 15–16 and 19) and pay both a monthly royalty known as the "7-Eleven Charge" (section 10), and an upfront fee (section 3).  Accordingly, when viewed correctly, the relationship between 7-Eleven and its franchisees is one in which 7-Eleven's franchisees pay 7-Eleven money in exchange for 7-Eleven's services. This exchange of services for payment is illustrated on page 24 of Exhibit 250, reproduced below.

AFFIDAVIT OF FRANCINE LAFONTAINE

*Exhibit 250, Page 24*
*7-Eleven provides services to, and receives payment from, its franchisees*



> Under its Franchise Agreement, 7-Eleven is required to provide services to help franchisees leverage the brand and successfully execute their business.

- License to use 7-Eleven's marks and system
- Store setup assistance
- Back-office systems
- Advertising
- Ongoing advisory support

- Upfront fee
- Monthly royalty



### ii.     7-Eleven's Franchisees And 7-Eleven Are Not In the Same Business

54.     In this analysis, I treat the term "business" as synonymous with a company's customary process of making money through commerce.  Treating a firm's profit-making activities as its business focus (or usual course of "business") is a standard approach by economists.  For example, one widely-read economics textbook states that "the objective of any firm, including a competitive firm, is to maximize its profits."  Similarly, textbooks in business strategy and marketing define the strategic goal of any firm as identifying and investing in the business activities of the firm that are most profitable.  For example, one textbook notes that any company "will want to put strong resources into its more profitable businesses." Thus, from an economics and business strategy perspective, a firm's usual course of "business" would be the predominant manner in which that firm generates profits. For my analysis in this report, I adopt that definition.

55.     As set forth in the following paragraphs, it is my opinion, to a reasonable degree of academic certainty, that the services franchisees perform – the operation and management of convenience stores – are not part of 7-Eleven's usual

AFFIDAVIT OF FRANCINE LAFONTAINE

course of business, which at its core involves the sale of franchises and the promotion of 7-Eleven's brand and business format.

> iii.   *Developing and Licensing Its Brand is 7-Eleven's Usual Course of Business*

56.     Business format franchisors like 7-Eleven customarily make their money by selling licenses to use their brand along with the training and support necessary to implement their business methods and format.  Franchisees buy these licenses and these services because they expect that the franchisor's brand equity will have a positive effect on the franchisee's ability to attract customers and because paying for the franchisor's know how and support is preferred relative to trying to create a new business concept from scratch.  In this way, franchisors are like business equipment manufacturers, except that they manufacture and sell a brand (an intangible asset instead of a tangible asset such as a machine) that franchisees purchase and use to make their own businesses run more efficiently.

57.     This economic reality can be seen in the existence of a robust franchise market, where different franchise businesses compete to sell their brands and business models to prospective franchisees.  Indeed, this market operates much like other service markets.  For example, there are trade shows and conventions for franchisees and franchisors to connect.  Franchise businesses compete to attract franchisees — for example, they compete for awards such as "best franchise." There are publications advising franchise businesses on how to market their offering to attract franchisees.  There are also organizations that provide intelligence about the franchise market and potential opportunities for franchisees, much like market analysts in other service markets.  7-Eleven competes actively in this franchise market.  7-Eleven's Director of Franchising has testified that 7-Eleven: (a) employs a marketing team with a budget of over $2,000,000, as well as two external marketing firms, to sell its franchises, (b) maintains a website advertising 7-Eleven's business format to prospective franchisees and listing available franchise

opportunities, and (3) employs an in-house team of sales representatives that manage franchisee relationships, attend franchising expos and run regular marketing seminars to attract potential franchisees.  See Trial Declaration of Arron Yount ¶ 8. In addition, Exhibits 243, 245, and 246, reproduced below, below show some examples of how 7-Eleven markets its business format to prospective franchisees.

*Exhibit 243*
***7-Eleven's marketing materials – Competing for potential franchisees by selling the brand***






Source:  7-Eleven, "Franchisease," available at https://franchise.7-eleven.com/franchise/home, accessed on November 22, 2019

AFFIDAVIT OF FRANCINE LAFONTAINE

1

***Exhibit 245***
***7-Eleven's marketing materials – Offering services like advertising & marketing support***



Source:  7-Eleven, "The Brand," available at https://franchise.7-eleven.com/franchise/the-brand, accessed on November 22, 2019

***Exhibit 246***
***7-Eleven's marketing materials – Promoting innovation of the brand***



Source:  7-Eleven, "7-Eleven Franchise Innovation | 7-Eleven Franchise," available at https://franchise.7-eleven.com/franchise/innovation, accessed on November 22, 2019

AFFIDAVIT OF FRANCINE LAFONTAINE

iv.    *7-Eleven's Corporate Stores Are Central to Supporting the Value of Its Brand*

58.    Of course, franchisors – including 7-Eleven – do make money in other ways.  For 7-Eleven, another way in which it makes money (outside of revenues from franchising their brand) is by running some of their own company-owned stores.  In what follows, I assess whether 7-Eleven's strategy of owning some stores means that 7-Eleven's customary process of making money is to operate retail outlets.  For a variety of reasons that I explain below, it is my opinion that operating retail outlets is not 7-Eleven's "usual," or customary, course of business.  Rather, operating such stores is simply part of 7-Eleven's broader strategy to develop, franchise, and profit from its brand.

59.    First, it is important to note that owning corporate stores is a common strategy for business format franchisors.  Most franchisors begin their existence operating the business concept that they then franchise later on (indeed, that is how they originally developed the business concept that they now sell).  Many choose to continue to operate some company-owned locations.  Out of the top 50 franchise businesses in the US, according to the Entrepreneur Magazine's Franchise 500® ranking (a source on which economists and other experts on franchising rely), 76% have a combination of franchised units and corporate units.  The main strategic advantage to a franchisor of operating some company-owned locations is to help it obtain important inputs into maintaining and improving its main line of business – selling the right to use its brand.  This is certainly true of 7-Eleven.

60.    For example, as is the typical practice amongst business format franchisors, 7-Eleven uses its company-owned stores as laboratories for testing new products and techniques designed to enhance brand equity.  This function is critical to the franchise system as a whole, because although the 7-Eleven brand must evolve to retain its value, franchisees are typically reluctant to adopt unproven products and techniques.  7-Eleven's company stores allow 7-Eleven to determine

AFFIDAVIT OF FRANCINE LAFONTAINE

whether its new products and techniques are profitable before it rolls them out through its franchise system.  7-Eleven's Director of Franchising has testified to a number of instances in which 7-Eleven used company-owned stores as laboratories for testing new products and techniques.  See Trial Declaration of Arron Yount ¶ 18. 7-Eleven's Senior Vice President for US Operations has also testified how 7-Eleven used company-owned stores to test its Business Transformation ("BT") system before making it available to franchisees.  See Trial Declaration of Doug Rosencrans ¶¶ 22-23.

61.    7-Eleven's company-owned stores also help support the development of its brand by alleviating what economists call the agency problem of hidden knowledge.  Franchisees have an incentive to hide information from their franchisors when doing so puts the franchisee in an advantageous position, even if sharing that knowledge would help the brand as a whole.  For example, because many 7-Eleven franchisees compete at least partly for customers with other 7-Eleven franchisees in their local market, if one franchisee identifies a product that is in high demand from consumers, that franchisee may have an incentive to keep this knowledge to itself to prevent other local franchisees from selling the same product. This helps the individual franchisee but injures the brand as a whole because it prevents the rest of the system locally from profiting from this information about consumer demand.  As there are limits to the degree to which a franchisor can monitor its franchisees (since those franchisees are geographically dispersed), a franchisor may not obtain reliable access to knowledge like this.  Having some company-owned stores allows a franchisor like 7-Eleven to gain knowledge of store operations and customer demand via its own employees and data-processing for these stores.  The franchisor can then spread the knowledge it gains from its company-owned stores throughout the franchise system.  7-Eleven also uses company owned stores to train new franchisees.  See Trial Declaration of Arron

AFFIDAVIT OF FRANCINE LAFONTAINE

Yount ¶ 16.  In this sense, 7-Eleven's company-owned stores are a necessary component of its franchise operations.

62.    A third way in which 7-Eleven's company-owned stores support and maintain 7-Eleven's brand value is the continuity they provide when a unit loses its franchisee for some reason.  Instead of allowing the unit to shut down or stand empty until the franchisor can find a new franchisee, a franchisor that operates company stores can put staff in place to operate the unit during the transition period.  Most of 7-Eleven's corporate stores are available for sale to franchisees 7-Eleven runs these stores temporarily to avoid site closures that may damage the brand, but 7-Eleven normally seeks to convert these stores to the franchise model as soon as possible. See Trial Declaration of Arron Yount ¶ 17.

63.    Notably, 7-Eleven's own data are consistent with corporate-owned stores being a relatively small, and complementary, part of its business model.  The total number of 7-Eleven stores in California makes up between 1% and 2.5% of the total number of 7-Eleven locations.  See Trial Declaration of Arron Yount ¶ 19.  Additionally, if we look at the net profits that flow to 7-Eleven corporate from its corporate-owned stores relative to the royalties earned from franchisees who purchase access to 7-Eleven's brand, we see that the latter dwarfs the former.  The net profits 7-Eleven earned from all corporate stores in California in 2017, 2018, and 2019 were, respectively, 1.15 percent, 0.89 percent, and 1.1 percent of the franchise royalties 7-Eleven earned in California.  See Trial Declaration of Arron Yount ¶ 19.

64.    In sum, the ancillary role that 7-Eleven corporate-owned stores play in support of 7-Eleven's franchising business, and the small percentage of profits that 7-Eleven receives from its company-owned stores, indicate to me that operating convenience stores is not 7-Eleven's customary way of making money.  7-Eleven's customary way of making money, and thus its usual course of business, is the sale of franchises using 7-Eleven's branded business concept and associated supportive

activities.  Accordingly, the services that the Plaintiffs claim they provide for 7-Eleven, operating convenience stores, fall outside 7-Eleven's usual course of business.  The usual course of 7-Eleven's business is the creation, maintenance and sale of a set of intangible assets, namely a brand, business format, and associated services.  Page 25 of Exhibit 250, reproduced below, summarizes my opinions on this point.

---

*Exhibit 250, Page 25*
***Developing and licensing its brand is 7-Eleven's usual course of business***

- Business format franchisors compete with each other to attract potential franchisees to grow their brand.
  - » Developing and growing a brand is a full-time business operation.
  - » It is a distinct business from operating retail locations.

- Business format franchisors like 7-Eleven earn money by selling:
  - » Licenses to use their brand, and
  - » Training and providing support to franchisees to implement their business methods.

- Franchisees pay to be part of the franchise system because:
  - » They expect the brand equity they receive will help attract customers, and
  - » They prefer to purchase the franchisor's know-how and support over creating a new business from scratch.

---

     *v.*    *The Conflicting Financial Incentives Of 7-Eleven and Its Franchisees Demonstrate That They Are in Different Lines of Business*

65.    I also base my conclusions regarding the differing businesses engaged in by 7-Eleven and its franchisees on an examination of the differing financial incentives at work in the relationship between 7-Eleven and its franchisees.  If 7-Eleven and its franchisees were truly in the same business, one would expect them to have the same (or, at least, aligned) financial incentives.  I have explained above that franchising is designed to help align the interests of franchisor and franchisees by eliminating the incentive to shirk that would exist if the franchisee were an

AFFIDAVIT OF FRANCINE LAFONTAINE

1   employee.  However, because the franchise contract is set up so as to make the

2   franchisee an independent business owner interested in maximizing the profits of its

3   individual units, a different type of misalignment of interests – known as "free

4   riding" – emerges between the franchisor and franchisee  Whereas shirking is an

5   incentive misalignment problem at the level of the individual person (i.e., between

6   an employer and its employee), free riding is an incentive misalignment problem

7   that arises between an individual franchisee's business and the franchise system.

8        66.    One of the most widely understood challenges of running a franchise

9   system is that, as residual claimants, individual franchisees have an inherent

10   incentive to "free ride," i.e. cut the quality (and therefore the expense) of the

11   services offered by their particular unit.  Franchisees can do this with the

12   expectation that the brand's reputation for quality (the brand's equity), as well as the

13   potentially transient nature of the customer base in many of the types of businesses

14   that rely on franchising, will continue to provide their unit with a sufficient supply

15   of customers.  For example, dirty bathrooms may discourage customers from

16   returning to a store, but it costs franchisees money (in the form of labor and cleaning

17   supplies) to keep the bathrooms of their store clean.  A franchisee can, therefore,

18   increase the bottom line for its business – and thus their own revenues – by cleaning

19   the bathrooms less often.  While this cost-saving may cause fewer of the

20   franchisee's usual customers to return to the franchisee's store after experiencing the

21   dirty bathrooms, the franchisee knows that losing some of the customers will be

22   offset, at least in part, by new transient customers (i.e., customers who usually shop

23   at other stores operating under the same brand) who come in the door because they

24   recognize the brand and associate it with quality.  Other examples of free riding that

25   could apply to convenience stores include selling expired merchandise, failing to

26   honor coupons or promotions, or failing to properly train employees.  Page 34 of

27   Exhibit 250, reproduced below, summarizes these problems.

28

AFFIDAVIT OF FRANCINE LAFONTAINE

***Exhibit 250, page 34***
***Individual franchisees have an incentive to free ride on the brand's equity***



- As residual claimants on profits, franchisees have an incentive to "free ride," or cut the quality (and expense) of operations at their unit.

- For example, by cleaning stores less often, a franchisee can reduce costs and thus increase their own income.

- They can do this because brand recognition and/or unique products (and the more or less transient nature of the customer base) will continue to drive customers to their store.

67.     These behaviors are reported by customers in complaints to 7-Eleven in Exhibits 265-71.   I was also provided with documents that provide examples of free-riding in stores operated by the named Plaintiffs.  In Exhibit 216, a 7-Eleven field consultant noted that a store operated by Serge Haitayan contained products with incorrect or missing date codes.  The field consultant also noted that the back room and bathroom of the store needed to be cleaned.  In addition, Robert Elkins received a notification letter (Exhibit 272) from 7-Eleven for selling out-of-code or uncoded products, and was required to immediately remove these products from his store

68.     While free riding creates potential financial benefits for the franchisee, it injures the franchise system as a whole.  If too many franchisees freeride, the brand will lose its reputation for quality.  This, in turn, will lower the brand's equity and, thus, make it more difficult to sell franchises as well as reduce the amount that the franchisor can charge franchisees for a license.  As a result, franchisors have strong financial incentives to make sure that their franchisees keep their quality standards high, even at the expense of their franchisees' bottom lines.  To continue

the previous example, franchisors want to ensure that franchisees keep their bathrooms clean, do not sell expired merchandise, and accept relevant coupons in order to preserve the brand's reputation for quality.

69.     Put another way, the reason there is incentive misalignment between franchisor and franchisees is because the franchisee is in the business of operating an individual unit and the franchisor is in the business of licensing its brand and intellectual property to a number of franchise owners.  Franchisees have an incentive to maximize the profits of their individual businesses by cutting corners on quality because they do not bear the full cost of that behavior, while franchisors like 7-Eleven have a countervailing incentive to ensure no corners are cut.  Franchise agreements – including 7-Eleven's franchise agreement – incorporate detailed service standard requirements in order to protect the franchisor's, and indirectly franchisees', interests in regard to maintaining brand equity.  Page 35 of Exhibit 250, reproduced below, summarizes these points.

*Exhibit 250, Page 35*
***The issue of free riding means franchisors and franchisees have misaligned financial incentives***

- Franchisees have an incentive to maximize net profits **of their own individual store locations**, including potentially by cutting corners on quality.
  - » They do not bear the full cost of reducing quality, because the brand's equity continues to attract customers.

- The franchisor wants to ensure that no corners are cut, to preserve brand equity.
  - » If the brand suffers, its current franchisees' profits will suffer, and it will have to charge a "lower price" for its licenses ultimately and/or sell fewer of them.

- Franchise agreements, including 7-Eleven's, incorporate service standard requirements to solve this incentive problem and protect brand equity.

- These standards do not only benefit 7-Eleven. They benefit the brand and, as such, every franchisee associated with the brand.

AFFIDAVIT OF FRANCINE LAFONTAINE

70.     These opposing financial incentives are consistent with the fact that franchisors and franchisees are not operating in the same course of business.  After all, the opposing business incentives described in the previous paragraphs are the product of the differing ways in which franchisors and franchisees make money.  7-Eleven's franchisees have an incentive to free ride because anything that reduces their operating expenses and does not reduce demand proportionally will increase their stores' net profits, and increasing their stores' net profits puts more money into the pockets of 7-Eleven's franchisees.  Increasing an individual store's net profits via cost cutting, however, does not put any additional money in 7-Eleven's hands.  Indeed, free riding actually takes money out of 7-Eleven's pockets, because free riding decreases the value of the 7-Eleven brand and thus decreases 7-Eleven's ability to charge upfront fees and royalties.  In other words, the different financial incentives that apply to 7-Eleven and its franchisees demonstrate that 7-Eleven and its franchisees make money in different ways by selling different things, and thus they are in different lines of business.  Page 36 of Exhibit 250, reproduced below, illustrates this point.

AFFIDAVIT OF FRANCINE LAFONTAINE

*Exhibit 250, page 36*
*Misaligned financial incentives show that 7-Eleven and its franchisees are in different lines of business*



### The Methods Described By *Vazquez* and Their Implications for Franchising

71.    I have reviewed the May 2, 2019, decision of the Ninth Circuit Court of Appeals in *Vazquez v. Jan-Pro Franchising International, Inc*.  Specifically, on pages 597–599 of that opinion, the Court of Appeals describes three different methods that courts have used in order to determine whether an individual provides services in a company's usual course of business.  They are: (1) "whether the work of the employee is necessary to or merely incidental to that of the hiring entity"; (2) "whether the work of the employee is continuously performed for the hiring entity"; and (3) "what business the hiring entity proclaims to be in."

72.    Without commenting on the legal reasoning in the Vazquez Decision, I was asked to address the practical implications, from an economics perspective, of applying these methods to the business format franchising relationship in general. As set forth in more detail below, due to the inherent nature of the franchising model, if any of these formulations were applied to any franchisor, not just 7-Eleven, I expect that franchisor would be deemed, incorrectly in my view, to be in

the same "course of business" as its franchisees. Accordingly, under the tests described by the Ninth Circuit, <u>all</u> franchisees are employees of their franchisors, no matter what the system. This would include franchisees that own many (in some cases hundreds) of units, which are often incorporated businesses with tens and sometimes hundreds of employees. In fact, because a number of these are publicly traded companies themselves, such a conclusion would imply that publicly traded companies would be deemed employees.

      i.    *The First Method*

73.    The first method of determining a usual course of business addressed by the Court of Appeals asks "whether the work of the employee is necessary to or merely incidental to that of the hiring entity." In its discussion of this formulation, the Court of Appeals focused on the fact that Jani-King (the franchisor in the *Vazquez* case) earned a percentage of the payments that customers paid for its franchisees' cleaning services. The Court of Appeals found this significant, because it showed that the franchisor was, in the Court's words "not indifferent to how much work unit franchisees do or how well they perform that work" (p. 598).

74.    As is apparent from my description of franchising above, if one casts the franchisor in the role of an "employer" and the franchisee in the role of "employee" because the franchisor's revenues are tied to the performance of the franchisee, then the franchisee's work is "necessary" to the franchisor in *every* franchise system. After all, a basic feature of the franchising model is that franchisors earn their money by licensing their business concept to franchisees, while franchisees earn their money (from which they pay the franchisor's licensing fees) by using the franchisor's business concept to sell goods or services to consumers. It follows that *no* franchisor could exist without franchisees as, without franchisees, the franchisor would have no income source.

75.    This is most starkly illustrated by considering the extreme case of franchise systems that have no corporate stores and hence derive all their income

39

1   from franchising.  Under this test, all these franchisees would be classified as

2   employees of the franchisor.  Some examples of fully franchised systems include

3   (numbers in brackets indicate the number of outlets for each system in California at

4   the end of 2018, based on my review of franchisor's publicly available franchise

5   disclosures): Subway (2,517), RE/MAX realty (371, 2017 figure is the most recent

6   available), ServPro restoration services (228), Dunkin' Donuts (85), and Midas

7   automotive service centers (72).

8       76.    I am also aware that 7-Eleven's royalty payments – the "7-Eleven

9   Charge" – are based on the percentage of its franchisees' gross profits.  This is not a

10  coincidence.  It is a standard practice in franchising to divide the franchisor's

11  compensation between an initial lump sum fee (which helps offset the franchisor's

12  initial outlays in establishing the franchise) and a periodic royalty in the form of a

13  percentage of the franchisee's sales, revenues, or gross profits.

14      77.    This practice serves three purposes.  First, it spreads the franchisee's

15  payment for the franchise out over the entire length of the contract.  If the franchisee

16  had to pay the full value of its franchise's income stream up front in a lump sum, not

17  only would that sum be crushingly large, but it would leave the franchisor with no

18  incentive to maintain the brand's value during the life of the franchise agreement.

19  After all, a franchisor must make continuous capital investments in order to

20  maintain the brand.  It must develop new products, modernize procedures, advertise,

21  and police free riding franchisees.  All these activities cost money that the franchisor

22  need not spend if it could instead collect an upfront fee and abandon the franchisee

23  to fend for itself.

24      78.    Second, indexing the periodic royalty to revenues or gross profits gives

25  franchisees the reassurance of knowing that the franchisor has a direct financial

26  incentive to help the franchisee succeed, especially by increasing sales.  If the

27  franchisor instead collected a flat monthly payment untethered to the franchisee's

28  success along with a fixed upfront fee, the result could be a perverse incentive for

the franchisor to let franchisees fail, repossess the franchisees, and then sell them again to a new franchisee for a new initial franchise fee.

79. Third, it provides risk-sharing between the franchisee and franchisor. If store sales are low, the franchisee will pay a smaller amount to the franchisor, so that some of the downside is passed on to the franchisor. If sales are high, then royalties paid to the franchisor will be higher. This reduces the uncertainty in the franchisee's earnings and therefore insulates the franchisee from some of the downside of owning the business.

80. Put another way, the *last* thing that a franchisee wants is a franchisor that is, in the words of the Court of Appeals, "indifferent to how much work unit franchisees do or how well they perform that work." It is, instead, in a franchisee's interest to give the franchisor a financial stake in the franchisee's success.

### ii. The Second Method

81. The Court of Appeals' second method seeks to determine whether "the services of the putative employee are continuously used by the hiring entity" (p. 598). As with the previous example, applying this formulation results in <u>all</u> business format franchisors being in the same course of business as their franchisees, and thus all franchisees would be employees. Franchising is, by nature and design, a long-term continuous contractual relationship between two parties. Indeed, long-term continuity is a primary advantage of the franchising model over the discrete contracting model, as franchising yields predictability in product offering at the retail level for consumers while avoiding the damage to brand equity that results from a lack of commitment to ongoing relationships with retailers.

### iii. The Third Method

82. The Court of Appeals' third method of determining a company's usual course of business calls for consideration of how that company describes its own business, usually in the form of advertising to the public. Again, if one were to use this method to determine the usual course of business of any business format

AFFIDAVIT OF FRANCINE LAFONTAINE

1  franchisor, the inevitable result would be a determination that franchisors are in the
2  same course of business as their franchisees.

3      83.    As previously discussed, at the core of every franchise is a brand.  That
4  brand has value to franchisees – meaning franchisees will pay a franchisor for a
5  license to use it – because it has value to consumers, i.e., consumers recognize the
6  brand, trust it, and will select it over competitors.  Not surprisingly, franchisors use
7  advertising to develop and maintain brand value.  Indeed, every large business
8  format franchisor that I examined advertises and markets on behalf of its brand at
9  the system level.  Exhibit 248 is a chart, prepared at my direction, that accurately
10  summarizes certain features of the franchise agreements (drawn from publicly
11  available franchise disclosure filings) of 12 large business format franchises.
12  Exhibits 278-289 are true and accurate copies of the franchise disclosures that I
13  reviewed.  All twelve business format franchisors that I examined collect marketing
14  or advertising fees from each of their franchisees that they use to pay for
15  consolidated, system-level advertising campaigns.  An example of system-level
16  advertising includes franchisors' websites which are commonly used as one route to
17  advertise the brand and offerings to end consumers.  Exhibit 249 is a true and
18  accurate compilation of advertisements on the websites of prominent business
19  format franchisors, such as McDonald's, Dunkin' Donuts, Baskin-Robbins, Edible
20  Arrangements, GNC, and Midas International.

21      84.    More generally, nearly all franchises with a national (or near national)
22  footprint provide advertising support for franchisees.  During the course of my
23  academic work, I examined 890 franchises and found 729 included a fixed
24  advertising fee or an advertising fee calculated as a share of revenue to support
25  advertising for the brand.  Moreover, even in chains that do not specify such a fee,
26  franchisors still spend money on advertising.  Not only does centralizing
27  advertisement and marketing at the system level allow the franchisor to control the
28  brand's message, but it also allows franchisees and the franchise system to benefit

AFFIDAVIT OF FRANCINE LAFONTAINE

from important economies of scale.  As I have noted, the franchisor can buy bulk advertising at prices that individual franchisees cannot because the "per unit" price of advertising falls with the volume of purchases.

85.     The problem this creates with respect to the Court of Appeals' third formulation, however, is that because franchisors design their system-level advertising to promote the services or products that their franchisees provide to consumers, that advertising makes it appear that the franchisor, and not the franchisee, is selling those products.  For example, Dunkin Donuts' advertising promotes Dunkin Donuts coffee and pastries, and McDonalds' advertising promotes Big Macs.  Accordingly, to the general public, McDonalds sells hamburgers and Dunkin Donuts sells coffee and pastries, even though (with the exception of company stores addressed above) they really are focused on a different set of activities.  Although franchisors do advertise and promote opportunities to purchase franchises, they do so in ways and locations frequented by prospective franchisees, not the public as a whole.  For example, as mentioned above, 7-Eleven has a separate website targeted at prospective franchisees where it advertises the benefits of franchising and its set of franchise opportunities.  Exhibit 243 is an example of this advertising.

**Implications for Other Franchises**

86.     While the analysis in the sections above focuses on 7-Eleven, it is also my opinion that the outcome of the employment inquiry in this case will apply to the entire franchising industry in California.  I hold this opinion because the relationship between 7-Eleven and its franchisees typifies the relationship between business format franchisors and their franchisees.  In Exhibit 248, I list more specific features of the 7-Eleven franchise agreement that are common to other large business format franchisors.  Specifically, the characteristics described above as determinative of

employer status (e.g., protection and investment in the brand by the franchisor, interest by the franchisor in the franchisee's success, continuity of the franchisor-franchisee relationship via rules of operation, and payment from the franchisee to the franchisor for access to the brand) are universal amongst business format franchisors.  Indeed, in its May 2008 "Compliance Guide" for 16 C.F.R. Part 436, available at https://www.ftc.gov/tips-advice/business-center/guidance/franchise-rule-compliance-guide,  the Federal Trade Commission defines franchise relationships as having three general characteristics: a promise by the franchisor to provide a brand, a promise by the franchisor to provide assistance and controls over the business operation, and the requirement of a payment by franchisee to franchisor.   As a result, a finding that 7-Eleven is an employer based on the tests set forth in *Vazquez* would, in my opinion, effectively convert all (or nearly all) franchisees and their employees in California into employees of the franchisor, thus putting an end to a business model that has stood the test of time, and that accounts for a significant amount of economic activity.

87.    As mentioned above, in the U.S., franchises account for 7.3 million jobs and over $1.3 trillion in economic activity.  Fundamentally altering the business model for such a large segment of the economy would have important negative implications.  It is my opinion that, unless one assumes that the purpose of *Vazquez* is to eradicate franchising in its entirety, one either has to concede that franchisees buy franchisors' services, as shown above in Section III.i, or concede that franchisors and franchisees are not engaged in the same course of business, as explained in Section III.ii.

<u>Analysis of 7- Eleven's Franchise Controls</u>

88.    I present two analyses regarding the level of control that 7-Eleven exercises over franchisees.

89.    First, as I explain below, while 7-Eleven imposes a set of controls on franchisees' business operations through its Franchise Agreement, such controls are

a necessary part of the franchising business model.  Indeed, the FTC, on page 1 of its Compliance Guide, defines a franchise as a commercial business arrangement that "exercise[s] significant control" over franchisees.

90.     Thus, if one were to determine that the level of control exercised by 7-Eleven made franchisees employees of 7-Eleven, then franchisees of nearly all franchises would become employees.  This would effectively end the franchising model as a form of business, which (as shown above) is a substantial part of the US economy.

91.     Second, even within the controls that 7-Eleven uses through its Franchise Agreement, each franchisee retains substantial discretion of critical aspects of their business operation.  For example, franchisees are largely able to choose the product mix they offer in their store, to set prices, and to make decisions about hiring and local advertising.  See Trial Declaration of Doug Rosencrans ¶¶ 13-20.  Since franchisees retain ultimate control over the operation of the business, they also keep the financial upside from doing so successfully.  As I show below, there is large variation in the level of net profits earned by 7-Eleven franchisees in California.  The large potential upside for franchisees provides the incentives consistent with giving them the freedom to run their business autonomously.

    *i.*    *Franchising requires some constraints on franchisees to preserve the brand*

92.     As I have previously stated, in the case of business format franchising, the franchisor's business consists of selling licenses to use its brand, systems, and know-how to franchisees.  These allow franchisees to achieve higher profitability than they would as independent businesses owners.

93.     Franchisees can influence the value of the brand because individual customers' experiences when they go into any branded establishment, including of course any 7-Eleven store, affect their perception of the quality of the brand and associated stores.  As I also noted, a franchisor's brand value can be eroded if too

many franchisees act in ways that reduce the perceived quality of the product or service.  Indeed, from time to time, all franchisees face incentives to free ride on the value of the brand and make decisions that, while in the franchisee's best interest, may be harmful to the brand.  Therefore, franchisees require that the franchisor "control" the behavior of other franchisees; that is, they require a guarantee that the brand will be preserved going forward.  This in turn requires some controls over franchisees to mitigate the free-riding problem. These points are summarized on page 43 of Exhibit 250, reproduced below.

*Exhibit 250, Page 43*
*Franchisees require a guarantee that the brand will be preserved going forward*

Customers' experiences when they visit a branded establishment affect their perception of the quality of the brand.

All franchisees at times face incentives to make decisions that increase their individual profits but are harmful to the brand.

Franchisees require that the franchisor "control" some aspects of the behavior of other franchisees to mitigate the free-riding problem.

94.    Accordingly, all franchisors create a system of constraints on franchisees and most of these constraints are quite similar across systems.  Where differences in the constraints exist, these are due to particular requirements of the franchise concept itself.  Some concepts are fairly simple and the collection of constraints necessary to present a consistent brand image to consumers may be quite limited.  Other concepts may present greater challenges to maintaining that consistency.

95.     While the exact types of constraints any given franchisor uses may depend on the specifics of its business concept, scale, and other factors, across franchise systems there remains a great deal of similarity among franchise agreements.  There are three main areas of constraints on the actions of franchisees contained in or referenced by the franchise agreement: 1) those that pertain to the ongoing payments to the franchisor; 2) those that relate to the execution of the concept; and 3) those that relate to the ownership of the franchise rights.  Each area is critical to franchising as a form of ongoing contractual relationship and appears in one form or another in all franchising agreements with which I am familiar.  Page 44 of Exhibit 250, reproduced below, summarizes these categories.

*Exhibit 250, Page 44*
*Franchise agreements contain three common areas of constraints...*

1.  Ongoing payments to the franchisor for access to the business concept and brand:
    » The ongoing royalty ensures that the franchisor has a continuing interest in the franchised business and invests in the brand.

2.  Execution of the business concept:
    » The set of agreed terms that franchisor and franchisees would like to see implemented by all franchisees to preserve the value of the brand.

3.  Ownership of the franchise rights:
    » Procedures for the transfer of franchise rights ensure future owners will also protect the brand.

96.     I discuss these areas of constraints in more detail below.

      a.  Typically, the franchisee's payment to the franchisor for the rights to operate under the franchisor's brand are in two parts: a fixed upfront fee and some form of ongoing royalty or profit sharing payment.  As mentioned above, the ongoing royalty

AFFIDAVIT OF FRANCINE LAFONTAINE

1  ensures that the franchisor has a continuing interest in the

2  operation of the franchised business and hence the incentive to

3  protect the value of the brand.  The franchisor's contractual

4  rights to these ongoing payments necessitate various types of

5  constraints on the franchisee's business.  For example, the

6  franchisee may be required to employ certain accounting

7  practices or point of sale technology that permit the franchisor to

8  monitor cash transactions to ensure the accurate reporting of

9  sales or gross profits.  This is particularly important in retail

10  operations where the potential for shrinkage is present.

11  b. Provisions that relate to the execution of the business concept are

12  central to all franchising agreements.  Many of the requirements

13  are detailed in the agreement itself, but others are contained in

14  the operations manual that is referenced in the agreement and

15  provides more detailed information for the day-to-day operations

16  of the business.  The franchise agreement and operations manual

17  contain the set of agreed terms that franchisor and franchisees

18  would like to see implemented by all members of the franchisee

19  network and provide certainty to franchisees about how other

20  franchisees will behave.  Constraints that 7-Eleven requires from

21  its franchisees in order to maintain brand consistency include

22  provisions related to the layout and appearance of stores such

23  that all stores look similar, a set of menu items that are

24  associated with the brand and must be offered at all times,

25  stipulations about the display of promotional and advertising

26  materials to ensure that they are consistent across stores and

27  markets, or inventory items (both food and non-food items) that

28  are purchased from a single supplier, or from a list of approved

AFFIDAVIT OF FRANCINE LAFONTAINE

1   suppliers that have been vetted by the franchisor for the quality
2   of products. For example, 7-Eleven's Franchise Agreement
3   (Exhibit 161 is an example), contains on pages 16 and 18
4   compliance clauses for 7-Eleven's "shelf life requirements with
5   respect to Fresh Foods," and "maintaining the Store, 7-Eleven
6   Equipment, other property in the Store and landscaped areas in a
7   clean, attractive, orderly, safe, and sanitary condition."
8   Compliance with these provisions often requires some degree of
9   policing by the franchisor, increasingly so where the business
10   concept is more complex and the franchise system is larger.

11   c.   The final set of provisions and constraints in the franchise
12   relationship relate to the ownership of the franchise itself.  In a
13   location-based franchise these may refer to the way in which the
14   site is chosen, the ownership of land and/or buildings, lease
15   provisions, site development, etc.  Ownership of the franchise
16   rights themselves is also an important area covered by the
17   franchise agreement.  Most systems have covenants that relate to
18   the transfer of these rights.  The franchisee owns the business
19   and can acquire equity (perhaps in the form of goodwill) in it that
20   can be sold to other franchisees.  However, because the
21   franchisor and the other franchisees have an interest in who is
22   operating within the system and want to ensure future owners
23   will also protect the brand, certain procedures are typically
24   included for transferring the franchise rights.

25   97.    7-Eleven's set of contractual provisions are consistent with prevailing
26   practices within the franchise industry.  They reflect the controls that are necessary
27   for franchising to function.  In Exhibit 248, I present an overview of the key areas of
28   constraints in the franchise agreements of 12 franchise systems that share some

characteristics with 7-Eleven – they are relatively large systems of retail outlets, and in some cases but not all, multi-product retail stores.  I find that the franchise agreements are very similar across all these systems, with constraints in the same areas of operations consistent with the motivation I have presented above – to preserve the value of the brand.

98.     In addition to agreeing to a set of quality standards with franchisees via the Franchise Agreement and Operations Manual, the franchise system requires a mechanism to enforce these standards.  Such enforcement is important to maintain the value of the businesses of its franchisees as well as maintaining the value of the franchised chain – without enforcement, imposing controls would have little effect.  Thus, it is common for franchisors to use some form of monitoring of performance to identify franchisees that shirk on their commitments and hurt the brand.  In Exhibit 248, I compared 7-Eleven's controls to those of twelve other franchises.  Using this same sample of franchises, I find that all but one of them have mechanisms for inspecting the stores and monitoring whether franchisees are complying with the standards set out in their franchise agreements; the exception is a franchise for in-home cleaning services where, understandably, inspections cannot be carried out.

99.     7-Eleven needs to actively monitor whether franchisees conform with the agreed standards and does so with the use of field consultants.  As their title suggests, field consultants' primary role, however, is to provide assistance and advice to franchisees, with the goal of increasing their effectiveness in running their business.

100.   It is my view that 7-Eleven's set of controls is very similar to those of other franchise systems, and is fully consistent with the economics of franchising.  It provides brand protections, which are valued by franchisees, while allowing franchisees the freedom to make decisions that are in the best interest of their business locally.  It therefore follows that, if 7-Eleven was found to be an employer

AFFIDAVIT OF FRANCINE LAFONTAINE

1   of franchisees on the basis of its controls, this conclusion would necessarily extend

2   to most franchise systems.  This again would threaten the existence of the

3   franchising model altogether.

4       ii.      *7-Eleven's franchisees have discretion over critical aspects of their*
                 *business*

5

6       101.   I have previously explained that franchising grants each franchisee the

    independence to grow their individual business using their localized knowledge of

7

8   market conditions.  This goes hand in hand with a profit incentive to do so, by

    making franchisees residual claimants of the profit of the store.  Franchising

9

10  therefore relies on franchisees having the freedom and ability to influence their

    store's financial performance: without providing them with ample levers to drive the

11

12  success of the store, there would be no sense in giving them the incentive structure

    to do so.

13

14      102.   The complexity of 7-Eleven's business concept means that there are

    many ways in which franchisees of a 7-Eleven store can influence the performance

15

16  of their store.  For example, below I provide some examples of levers available to

    franchisees that will be important determinants of the profitability of stores. These

17

18  are summarized on page 45 of Exhibit 250, reproduced below.

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF FRANCINE LAFONTAINE

*Exhibit 250, Page 45*
*7-Eleven's franchisees have many levers to influence the performance of their stores*

| Product Mix | Price Setting |
|---|---|
| • Franchisees can use localized knowledge of customer preferences to stock products that are likely to sell. | • 7-Eleven provides suggested retail prices, but franchisees set final prices.<br>  » Exception: gasoline is sold on consignment at prices specified by 7-Eleven. |

| Labor Decisions | Local Advertising |
|---|---|
| • Franchisees make hiring decisions and have complete control over labor relations, pay, and other conditions. | • 7-Eleven promotes the brand through national advertising, and franchisees can develop individual strategies for local advertising. |

a. Product mix – While the franchise agreement requires that franchisees purchase from a particular set of vendors and offer a subset of products, these constraints are consistent with the rationale for controls that I previously discussed – the products that franchisees are required to carry in their stores are those that will generate strong brand recognition. However, franchisees are responsible for choosing the full mix of products to make available to their customers, see Trial Declaration of Doug Rosencrans ¶ 13, and 7-Eleven's Franchise Disclosure Document informs each franchisee that "[a]s an independent contractor, you can select merchandise for your store and the vendors you buy from," see Exhibit 251 at 34.   Franchisees are able to use their localized knowledge of customers' preferences to stock those products that are most likely to sell at every point in time.

b. Price setting –Franchisees are able to determine prices for their products; 7-Eleven only provides suggested retail selling prices. See Trial Declaration of Doug Rosencrans ¶ 15.

      c.  Labor decisions – Section 2 of the Franchise Agreement (again, Exhibit 161 is an example) states that franchisees must "exercise complete control over and responsibility for all labor relations." Franchisees are therefore free to make the hiring decisions pertaining to their store – whether to manage their store directly or hire a store manager, how many additional staff to hire, or what pay and other conditions to offer. See Trial Declaration of Doug Rosencrans ¶¶ 19-21.

      d.  Local advertising – While 7-Eleven promotes the brand through a national advertising campaign that all franchisees benefit from, under Section 22 of the Franchise Agreement, franchisees have the freedom to develop an individual strategy for local advertising.  This involves decisions over which media to use, the timing of advertisements or which products or aspects of the offering to highlight in advertisements. See Trial Declaration of Doug Rosencrans ¶ 17.

103.   In summary, franchisees have discretion over crucial decisions in running their business.  They might be successful in driving higher performance for their store(s) than for the average store, and for those that do achieve such success, the financial reward can be substantial.  Conversely, those that run their business poorly may make losses.

I declare under penalty of perjury that the foregoing is true and correct and executed on March 23, 2021.

*Francine Lafontaine*

Francine Lafontaine, Ph.D.

AFFIDAVIT OF FRANCINE LAFONTAINE